619 F.2d 1124
 UNITED STATES of America, Plaintiff-Appellee,
v.
Francisco RICARDO, Maximillano Periera Torres, Pedro Pablo
Pemienta Garcia, Orlando Rodriquez-Marino, Rosendo
Conrado, Sidney Albert Neuman and Daniel
Hartwell Durrange, Defendant-Appellants.
 No. 79-5358.
 United States Court of Appeals,
Fifth Circuit.
 June 25, 1980.
 
 1
 Mark Vela, Houston, Tex. (Court-Appointed), for Conrado, Ricardo, Torres, Garcia and Rodriguez.
 
 
 2
 Sherman A. Ross, Fred T. Bennett, Houston, Tex., for Neuman and Durrange.
 
 
 3
 James R. Gough, John M. Potter, Asst. U. S. Attys., Houston, Tex., for plaintiff-appellee.
 
 
 4
 Appeals from the United States District Court for the Southern District of Texas.
 
 
 5
 Before VANCE and SAM D. JOHNSON, Circuit Judges, and THOMAS*, District Judge.
 
 DANIEL HOLCOMBE THOMAS, District Judge:
 
 6
 Appellants were convicted of two marijuana counts,[1] stemming from the seizure of a shrimp boat, the SINCERE PROGRESS I, in the Gulf of Mexico, on the late evening and early morning of November 4-5, 1978. Following their convictions, appellants Ricardo, Torres, Garcia, and Rodriquez-Marino were sentenced to three and one-half (3 1/2) years imprisonment with a special parole term of five (5) years on each of Counts I and II, to run concurrently. Due to their increased involvement in the drug transaction, appellants Conrado, Durrange, and Neuman received ten (10) years. In addition, Durrange and Neuman received $15,000 consecutive fines on Counts I and II. All of the appellants are Colombian, with the exception of Durrange and Neuman, who are American. In order to understand the nature of appellants' arguments, a recital of the factual setting is necessary.I. FACTS
 
 
 7
 On November 4, 1978, a Coast Guard cutter, the POINT HOPE, was instructed to proceed southeast from Galveston, Texas, to a point approximately 125-150 miles from the American coast, in order to search for a fishing boat of unknown nationality. The vessel was reported to be without power and was drifting in a northerly direction with the assistance of a makeshift sail. Several hours later, a vessel was sighted which fit the radio description. Approaching the vessel from the stern, the crew from the cutter noticed tobacco-like sweepings 50-100 yards astern. The cutter then proceeded to circle the vessel in order to determine the vessel's nationality and rating. There was no visible markings, either on the stern or the bow of the vessel, and no flag was being flown. It was determined from the side of the deckhouse that the vessel's name was the SINCERE PROGRESS I.
 
 
 8
 Radio contact could not be established with the SINCERE PROGRESS but shortly after the initial approach, one of the defendants (Neuman) appeared on deck. From an account of the subsequent conversation with Coast Guard officers, the following facts were ascertained: There were two Americans on board (Neuman and Durrange), and five Colombians (Ricardo, Torres, Garcia, Rodriquez-Marino, and Conrado), none of whom could speak English. The Americans were allegedly on board because their sailboat had sunk off the coast of Florida and they had been rescued by the Colombians. However, when asked about specifics, neither American could remember the name or registration number of their "lost" sailboat.
 
 
 9
 While Neuman and Lieutenant Veselka were conversing, objects were thrown overboard from the SINCERE PROGRESS. The cutter retrieved the objects, which were later examined and determined to be nautical charts. These charts had markings on them, indicating that the SINCERE PROGRESS's probable destination was a point approximately sixty miles off the coast of Matagorda, Texas. The charts also indicated that the SINCERE PROGRESS began its journey in Colombia and proceeded through the Caribbean Sea and Yucatan Channel into the Gulf of Mexico.
 
 
 10
 Without the assistance of an interpreter, communication with the Colombians was difficult. The POINT HOPE, which had been maintaining radio contact with the New Orleans headquarters, received instructions to board the SINCERE PROGRESS, ostensibly for the purpose of determining nationality and registry. A boarding party of three crew members was dispatched to retrieve this information. Once on board, papers reflecting registry of the vessel were requested, but none could be produced. Appellant Neuman stated that all the vessel's papers and logs were washed overboard in a storm. The engine room main beam was then examined for registry information, but none could be found. A nameplate on the wheelhouse gave the manufacturer's insignia, "Atlantic Marine, 1969." Finally the hold of the ship was examined, and it was here that the marijuana was discovered.
 
 
 11
 The two Americans requested that they be allowed to return to port on board the POINT HOPE. This request was granted upon the condition that they be placed under arrest and read their Miranda rights. The other defendants remained on the PROGRESS, and, due to high seas, were given towing assistance into the Galveston port. The two vessels arrived in Galveston on the night of November 5, 1978. At that time, the Americans were again read their Miranda rights and then questioned by a Federal agent with the Drug Enforcement Agency (DEA). Appellant Neuman said that he built a sailboat in Florida which later sunk off the coast in a trial run. This allegation ties in with his story about being rescued by the SINCERE PROGRESS and explains why he could not remember the sailboat's name or registration number. Appellant Durrange told a similar story. In addition, both appellants stated that they knew marijuana was on board the PROGRESS.
 
 
 12
 The Colombians were not placed under arrest until November 7, 1978. At that time they were advised of their constitutional rights but none of them would answer questions about the marijuana. The day before (November 6), appellant Conrado was interviewed by Immigration Investigator Lee Prejean concerning citizenship and alien matters. At that time, Conrado volunteered several incriminating statements without the benefit of a Miranda warning. He stated that the crew of the SINCERE PROGRESS was hired by two unknown Cubans who gave them coordinates to follow through the Yucatan Channel and into the Gulf of Mexico. There, the SINCERE PROGRESS was to rendezvous about sixty miles off the Texas coast with another vessel for the purpose of transferring the marijuana cargo. In order to corroborate his story, he produced a chart indicating similar coordinates to the charts previously thrown overboard and retrieved by the Coast Guard cutter.
 
 
 13
 Several issues are raised on appeal. We deal separately with the jurisdictional challenge, the issues relating to the exclusion of certain evidence, the effect of trial publicity on the jury, and the sentences imposed on appellants Durrange and Neuman.
 
 II. EXTRATERRITORIAL JURISDICTION
 
 14
 Appellants' initial challenge concerns the district court's jurisdiction over the case. Their argument is based in part on the premise that in order for extraterritorial acts to be in violation of the laws of the United States, there must be some nexus to the United States. The argument follows that there were no acts committed within the territorial jurisdiction of the United States and that, as a result, jurisdiction is improper.
 
 
 15
 The circumstances of the case reveal that the plan commenced outside the United States. Charts confiscated during the investigation indicate that the voyage originated in Colombia. According to the Americans, they left in their sailboat from Miami, Florida. Assuming their version is correct,[2] the only nexus to the United States is indirect because they were not the masterminds behind the scheme. When the PROGRESS was intercepted, it was approximately 125-150 miles from the Texas Coast. From these facts alone, it is apparent that the Government failed to prove the existence of an overt act committed within the United States. The Government did prove, however, that the PROGRESS intended to rendezvous with another vessel off the coast of Texas, in order to unload their cargo. Given this proof, along with the proximity to the United States coast and the general heading of the ship, we are convinced that the object of appellants' plan had consequences within the United States. Under these circumstances, the question we now address is whether, pursuant to either conspiracy statute, a territorial act must be committed within the United States and in furtherance of the conspiracy before jurisdiction attaches.
 
 
 16
 Under the conspiracy statutes in question, §§ 846 and 963, it is not incumbent upon the Government to allege or prove an overt act in order to obtain a conviction. See United States v. Mann, 615 F.2d 668 (5th Cir. 1980); United States v. Rodriguez, 612 F.2d 906, 919 n. 37 (5th Cir. 1980) (en banc ). While it is now settled law that proof of an overt act is not required under the conspiracy statutes, the jurisdictional requisites are not settled. The United States and this Circuit have traditionally adhered to the objective principle of territorial jurisdictional, which attaches criminal consequences to extraterritorial acts that are intended to have effect in the sovereign territory, at least where overt acts within the territory can be proved. United States v. Postal, 589 F.2d 862, 885 (5th Cir.) and cases cited therein. Implicit in these statutes is the notion that the prescribed prohibitions apply extraterritorially. See United States v. Cadena, 585 F.2d 1252, 1259 (5th Cir. 1978). It seems somewhat anomalous, however, that Congress intended these statutes to apply extraterritorially, but that jurisdiction attaches only after an act occurred within the sovereign boundaries. Thus, even though the statutes were designed to prevent one type of wrong ab initio, under the traditional approach, the courts were without power to act. This dichotomy directly contravenes the purpose of the enabling legislation.
 
 
 17
 As a result, it is now settled in this Circuit that when the statute itself does not require proof of an overt act, jurisdiction attaches upon a mere showing of intended territorial effects. Postal, 589 F.2d at 886, n. 39. The fact that appellants intended the conspiracy to be consummated within the territorial boundaries satisfies jurisdictional requisites. Under the most recent holding in this Circuit, we conclude that, ". . . the district court had jurisdiction to try the defendants for a conspiracy aimed at violating United States law and intending effects in its territory even in the absence of proof of an overt act committed within this country." Mann, 615 F.2d at 671. See also United States v. Baker, 609 F.2d 134 (5th Cir. 1980).
 
 III. THE EVIDENCE ADMISSIBLE OR INADMISSIBLE
 
 18
 Appellants challenge certain evidence admitted over their objections. Among the arguments made are three assertions which we now address.
 
 
 19
 A. Authority for Boarding and Searching the PROGRESS.
 
 
 20
 After the initial stop of the PROGRESS, the cutter received orders from its New Orleans headquarters to board and search the unidentified vessel. The boarding was to be conducted ostensibly for the purpose of determining the PROGRESS's nationality and registry. A boarding party was dispatched and during the course of their investigation, they uncovered the marijuana in a concealed aft cargo hold.
 
 
 21
 Appellants contest the stop and subsequent search for two reasons: (1) the initial stop was merely a pretext for the unauthorized purpose of searching for an, as yet, undermined cargo, and (2) the search was not based on a reasonable suspicion that criminal activity was afloat, thus precluding any evidence seized during the search.
 
 
 22
 As a result of the Coast Guard's unauthorized activities, appellants' challenge the admissibility of the marijuana. After reviewing the circumstances surrounding the search, we conclude that the search was based on reasonable suspicion and that the Coast Guard was authorized in seizing the marijuana.
 
 
 23
 The Coast Guard, pursuant to 14 U.S.C. § 89(a), has the authority to board any vessel of the American flag. This authority extends beyond the twelve-mile limit,[3] where it is plenary, and need not be founded on any particularized suspicion. United States v. Warren, 578 F.2d 1058, 1064-65 (5th Cir. 1978). Once the boarding is authorized, the Coast Guard has the right to conduct documentations and safety inspections. Furthermore, if there is reason to believe that a violation of United States law has occurred, the Coast Guard has the additional authority to conduct searches, seize evidence, and make arrests. Warren, 578 F.2d at 1065.
 
 
 24
 The Warren case authorized searches and seizures aboard American vessels. This authority extends to foreign vessels, but is based instead, on principles of international law. Due to the dangers inherent in stopping foreign vessels, the power of the United States in such circumstances is limited to the preservation of specific interests. Among those interests is the right of the United States to insure that its laws are respected. In order to enforce laws of the sovereign territory, the Coast Guard may order a foreign vessel to stop if there is reasonable suspicion for believing that criminal activity may be afloat. Accord, United States v. Cadena, 585 F.2d 1252, 1259 (5th Cir. 1978).
 
 
 25
 There are ample grounds for concluding that reasonable suspicion existed in this case. Appellants assert that the POINT HOPE had no right to zero in on this vessel. This proposition, however, is totally without merit. The POINT HOPE had been alerted to intercept a seemingly "disabled" ship by a passing freighter and later by a Coast Guard spotter plane. Once the PROGRESS had been located, the Coast Guard tried to contact the ship under the traditional international principle known as the right of approach.[4] This attempt failed, but the cutter noticed tobacco-like sweepings trailing the ship's stern. In addition, charts, which were jettisoned by the PROGRESS's crew, were seen drifting away from the ship. Unable to secure the appropriate information concerning the PROGRESS's nationality, the cutter received instructions to board the vessel. We conclude, based on the circumstances known to the Coast Guard at that time, that they were justified in boarding the vessel.
 
 
 26
 In like manner, we reject appellants' argument that the marijuana was illegally seized. The marijuana was discovered during the course of the investigation. Even though it was located in a concealed cargo hold, the discovery was proper. Appellants have no legitimate expectation of privacy in the hold of a shrimp boat. Had the discovery been made in the private living quarters of the crew, then we would be faced with a different question. However, in view of where the marijuana was located, the Coast Guard was authorized to seize the contents found in the hold of the ship. In addition, once it became apparent that a violation of United States law had occurred, the Coast Guard was authorized to conduct searches, seize evidence, and make arrests. This authority extends to any vessel on the high seas, whether American, Warren, 578 F.2d at 1065, or foreign. Cadena, 585 F.2d at 1263. Accordingly, the stop and search was reasonable and the illegal contraband was properly seized and admissible during the trial of this case. See, United States v. Monroy, 614 F.2d 61 (5th Cir. 1980).
 
 B. Examination of Appellant Conrado
 
 27
 Shortly after the Coast Guard cutter and the SINCERE PROGRESS arrived in Galveston, an Immigration Inspector, Lee Prejean, interviewed appellant Conrado with respect to the status of his citizenship. During the course of his interview, Conrado voluntarily told the inspector that the PROGRESS had departed from Colombia with directions to meet another vessel between Cuba and Mexico. In support of his story, Conrado supplied the inspector with a chart, indicating the scheduled coordinates of the voyage. The inspector, in turn, gave this evidence to Drug Enforcement agents, who took over the investigation.
 
 
 28
 Conrado argues on appeal[5] that prior to this time, he was not advised of his constitutional rights. As a result, statements that he made and exhibits which he turned over were not admissible during the trial. While it is true that Inspector Prejean knew of the PROGRESS's custody, we do not believe that his interview with Conrado was in the nature of an interrogation. Instead, the inspector was merely questioning his alien status. Any statements made by Conrado were volunteered, and there were no overtures made towards soliciting or coercing an incriminating statement. As a result, the statements were not subject to the customary Miranda warnings and were properly admitted. See, United States v. Sanchez, 449 F.2d 204, 209 (5th Cir. 1971). In addition, the production of the chart was proper because Miranda does not apply to the introduction of physical evidence. Warren, 578 F.2d at 1072. Accordingly, we dismiss Conrado's challenge.
 
 C. Prior Drug Arrests of the Colombians
 
 29
 During the trial proceedings one of the Drug Enforcement agents testified that four of the Colombians had been involved in previous drug smuggling operations. While none of the appellants were convicted in these prior incidents, the trial judge concluded that they were relevant to prove intent and thus admissible under Fed.R.Evid. 404(b). The Colombians contend that the offenses were extraneous and not shown to be in violation of United States law, thus precluding their admission. In addition, the Americans argue that because they were not involved in the prior offenses, their request for severance should have been granted. We find the Americans' contention to be entirely without merit, and consider only the Colombians' question.
 
 
 30
 Rule 404, Fed.R.Evid. permits, "evidence of other . . . acts . . ." in order to show, ". . . proof of motive, opportunity, intent, . . . plan (or) knowledge . . .". Under this rule, the acts, even though extraneous, need not be prohibited in and of themselves. United States v. Leaphart, 513 F.2d 747, 748 (10th Cir. 1975). In addition, the extraneous act need not be proved beyond a reasonable doubt, nor by clear and convincing proof. The rule mandates that: (1) it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character, and (2) it must possess probative value that is not substantially outweighed by its undue prejudice, under the guidelines proscribed in Rule 403, Fed.R.Evid. United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978). Although appellants argue that Broadway's essential physical elements test is the governing principle, United States v. Broadway, 477 F.2d 991 (5th Cir. 1973), Beechum expressly overruled Broadway. Beechum, 582 F.2d at 910. Applying these principles to the facts of the case, we hold that the extraneous evidence was properly admitted.
 
 
 31
 The prior importation cases involved large quantities of marijuana. Both incidents suggested a plan to smuggle the contraband into the Gulf of Mexico for later importation into the United States. In addition, in each case, three of the four apprehended Colombians were acting in concert. While these facts may not prove their guilt beyond a reasonable doubt, there is sufficient evidence available for a jury to find that the preliminary fact existed. Beechum, 582 F.2d at 913. The Government offered proof that the preliminary fact existed, as well as demonstrating that the intent in all the cases was similar. This proof is similar to the present offense and thus probative, and is relevant to prove intent. Accordingly, the trial judge was correct in allowing the evidence.
 
 IV. TRIAL PUBLICITY
 
 32
 The trial of this case originally took place in January and February of 1979, at which time all of the defendants were convicted. However, due to a lost transcript, the case had to be retried. The second trial commenced on June 11, 1979. After the first day of the retrial, certain newspaper articles appeared in both the local paper and the Houston papers. Due to the large quantity of marijuana involved, the trial received an inordinate amount of publicity. In addition, certain articles related the facts as well as the convictions, of the former trial.
 
 
 33
 Appellants moved to individually voir dire the jury and, in the alternative, to sequester the jury for the remainder of the trial. Both motions were denied, as was appellants' motion for a mistrial. On appeal, appellants challenge this denial as being a deprivation of their Sixth Amendment right to a fair and impartial jury. We disagree.
 
 
 34
 Appellants made no showing that they were actually prejudiced by the various accounts of the trial proceedings. Circulation statistics were not provided and the trial judge admonished the jury before the trial began not to seek or consider other sources of information. It is our conclusion that the trial judge properly exercised his discretion. See United States v. Palacio, 477 F.2d 560, 561 (5th Cir. 1973); United States v. Ochoa, 543 F.2d 564, 566 (5th Cir. 1976). Juror exposure to news accounts about a particular trial or to information about a defendant's prior convictions does not presumptively deprive him of due process. Murphy v. Florida, 421 U.S. 794, 799, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975). This case did not contain the pervasive influence of the news media, and we are not persuaded by appellants' argument to the contrary.
 
 V. THE AMERICANS' SENTENCE
 
 35
 Appellants Durrange and Neuman were sentenced to the maximum term of years plus the maximum fine allowed by law. These sentences were considerably more stringent than those imposed on the Colombians. The Americans challenge this sentence because of their belief that it was imposed in retribution for their failure to respond to questions solicited by their probation officer. As a result of their failure to cooperate, they contend that they were penalized for exercising their Fifth Amendment rights.
 
 
 36
 The trial judge stated in sentencing the Americans that he believed that, contrary to their stories, they had substantial roles in the smuggling operation. He commented on their silence, not in an attempt to deny them their privilege but rather, to invite them to refute his inference of their pivotal role. They declined this invitation after consulting with their counsel, and we are convinced that the judge based their sentences only on the evidence of record. Accordingly, their privilege was not penalized. Cf. United States v. Williams, 579 F.2d 369, 371 (5th Cir. 1978).
 
 VI. CONCLUSION
 
 37
 The Americans finally contend that the evidence against them was not sufficient and that, as a result, their convictions should be overturned. After reviewing the record, we disagree with that assessment. Their convictions, as well as those of their Colombian counterparts, must stand.
 
 
 38
 AFFIRMED.
 
 
 
 *
 District Judge of the Southern District of Alabama, sitting by designation
 
 
 [1]
 All defendants were charged with and convicted of: Count I, conspiracy to import marijuana, pursuant to 21 U.S.C. § 963, and Count II, conspiracy to possess marijuana with intent to distribute it, pursuant to 21 U.S.C. § 846
 
 
 [2]
 Which was neither proved nor refuted to anyone's reasonable satisfaction
 
 
 [3]
 The 12-mile limit includes the territorial sea, which extends to 3 miles from the coast, and the contiguous zone, which extends from 3 to 12 miles from the coast
 
 
 [4]
 This right, which is an exception to the principle of noninterference on the high seas, authorized the Coast Guard to board any vessel, if it suspects that the vessel is of United States nationality. Convention of the High Seas, art. 22. Failure to fly its flag or exhibit its nationality, the presence of American interpreters, and the proximity to and bearing towards the United States coast generate ample suspicion that the PROGRESS may have been of American registry. Accordingly, the Coast Guard was also authorized to board the vessel under the right of approach doctrine. See, United States v. Postal, 589 F.2d at 870-72
 
 
 [5]
 The other appellants lack standing to raise Conrado's Fifth Amendment privilege and do not enter into this consideration. See, United States v. Rubin, 559 F.2d 975, 984 (5th Cir. 1977)