UNITED STATES of America, Appellee,

v.

Joseph MANZELLA, Jr., Hubert T. Crabtree, Harold Blanchard, Joseph Robert Provenzano, Herbert Thibodaux, Joseph Jimenez, Jr., and Dr. Salvatore Canale, Appellants.

No. 85–3050.

United States Court of Appeals,
Fifth Circuit.

Feb. 13, 1986.

Daniel A. McGovern (court appointed), New Orleans, La., for Manzella.

G. Patrick Hand, Jr., New Orleans, La., for Thiboduax.

Wm. J. O'Hara, III, John-Michael Lawrence, New Orleans, La., for Crabtree.

Provino Mosca, Patrick Fanning, New Orleans, La., for Provenzano.

Edward J. Castaing, Jr. (court appointed), New Orleans, La., for Blanchard.

Virginia L. Schlueter, Appellate Federal Public Defender (court appointed), New Orleans, La., for Jimenez.

Ralph Capitelli, New Orleans, La., for Dr. Canale.

Louis M. Fischer, Washington, D.C., Virginia Bitzer, New Orleans, La., for appellee U.S.

Before GEE, and JOHNSON, Circuit Judges and SCHWARTZ,* District Judge.

GEE, Circuit Judge:

Today we consider the appeals of seven men convicted of committing various crimes as part of an ongoing criminal operation in Louisiana. For their efforts, most were found guilty of violating, and conspiring to violate, the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–68. Two of the appellants were convicted under 18 U.S.C. § 1341 for using the United States mail in furtherance of schemes to defraud their insurance companies. On appeal, each raises myriad grounds for reversal. After examining all of their assertions, however, we find no

---

* District Judge of the Eastern District of Louisiana, sitting by designation.

cause to reverse their convictions and therefore affirm the trial court's judgment.

Appellant Joseph Provenzano was the kingpin of a Louisiana crime organization involved in, among other transgressions, arson, extortion, and mail fraud. Several men worked for him, including Johnny Toal, Rondell Hulbert, John Rietzke, and appellant Harold Blanchard.[1] The organization also had many patrons of its services. Appellants Herbert Thibodaux and Hubert Crabtree twice asked Provenzano to burn down a competitor's lounge, requests resulting in two separate arsons. Appellant Salvatore Canale, who apparently suffered many marital difficulties, resolved to end his problems by destroying the property of his estranged wives. Two discussions with Provenzano resulted in the destruction of an automobile that he believed was owned by his second wife (although it actually belonged to a friend of hers) and a conspiracy to burn down a New Orleans restaurant owned by his third wife. Appellant Joseph Manzella had Provenzano's men burn down a building he owned so that he could collect the insurance proceeds. Appellant Joseph Jimenez had the organization "steal" his car so he too could defraud his insurance company.

Unfortunately for the appellants, word of their enterprise reached the federal authorities. To build a case against the organization and its customers, the government concentrated on obtaining the cooperation of Provenzano's henchmen. This tactic proved enormously successful; every subordinate except Blanchard became a government informant who both told the government everything he knew and helped the government obtain taped conversations with the appellants. The government used this evidence to obtain the convictions of all seven appellants.

Several of the appellants were indicted for both participating in a criminal enterprise and conspiring to violate RICO.

Count one of the indictment alleged a conspiracy to violate § 1962(c), which is itself a violation of § 1962(d). Count two alleged actual violations of § 1962(c). These two provisions are as follows:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

The necessary definitions are in 18 U.S.C. § 1961. A "pattern of racketeering activity" is defined in § 1961(5) as requiring at least two acts of racketeering activity within a ten year span. "Racketeering activity" means, among other things, "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under state law and punishable by imprisonment for more than one year." § 1961(1)(A). Finally, "enterprise" is given a liberal meaning in § 1961(4) as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

Other counts of the indictment charged Manzella, Jimenez, Provenzano, and Blanchard with violating 18 U.S.C. § 1341 by using the mail to defraud insurance companies. The appellants were found guilty of most, but not all, counts, 602 F.Supp. 230. We now consider their arguments on appeal.

## I. THE RICO ENTERPRISE

Several of appellants' arguments require us to expound the law of the RICO enter-

---

**1.** After oral argument, we granted Blanchard's motion to dismiss his appeal and Provenzano's motion to adopt Blanchard's arguments for his own use. We will still refer to these arguments as Blanchard's, with the understanding that their consideration is now on Provenzano's behalf.

prise. Although the federal courts have often dealt with RICO over the past few years, the law is still new enough to engender uncertainty. Part of the problem stems from the difficulty in distinguishing the criminal enterprise from the criminal conspiracy. The tenets of conspiracy law are familiar to all; such rules constitute a considerable portion of this country's criminal law. They must not become blinders, however, that affect our interpretation of RICO. The criminal enterprise is a creature different from the conventional conspiracy; its unique nature arises from specific federal legislation independent of the common law of conspiracy. To help flesh out the nature of the criminal enterprise, therefore, we devote a considerable part of our review to appellants' interpretations of RICO.

■ Appellant Canale was indicted under the RICO counts because of two meetings he had with Joseph Provenzano. In December 1979, Canale asked Provenzano to set fire to the car of his second wife, Isabelle. In February 1981, Canale again requested the services of Provenzano organization, this time to torch the restaurant owned by his estranged third wife, Kristina. He never tried to commit the arsons himself, instead conspiring with Provenzano on two occasions. These meetings nevertheless sufficed to violate § 1962(c) and (d).

■ The government's theory at trial was that Canale engaged in a pattern of racketeering in the guise of his two meetings with Provenzano. Although Canale now asserts that these conspiracies cannot be the predicate acts required to constitute a pattern of racketeering, we hold otherwise. In *United States v. Weisman,* 624 F.2d 1118, 1123–24 (2nd Cir.1980), *cert. denied* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980), the court held that a conspiracy to engage in § 1961(1)(D) racketeering activity could be a predicate act for a § 1962(c) violation. Influenced by *Weisman's* reasoning, we have recognized that the language of § 1961(1)(A) is similar to that of § 1961(1)(D); therefore, "[i]f conspiracy to commit a subsection D offense can serve as a predicate act for a RICO charge, then conspiracy to commit a subsection A offense should also be able to serve as a predicate act." *United States v. Welch,* 656 F.2d 1039, 1063 n. 32 (5th Cir. 1981), *cert. denied* 456 U.S. 915, 102 S.Ct. 1768, 72 L.Ed.2d 173 (1982). The wording of § 1961(1)(A) supports this view, as it defines "racketeering activity" as "any act or threat ... involving arson...." This language allows for more than arson itself as a predicate act and seems broad enough to include conspiracy to commit arson.[2]

**2.** Two issues immediately arise, but we need not decide their merits since Canale failed to raise them. They are mentioned here nevertheless because of the interesting insight they provide into the often imperfect mesh between conventional conspiracy law and RICO's new criminal enterprise concept. A fascinating conundrum arises because the government decided to charge Dr. Canale under both § 1962(c) and (d). Ordinarily, separate sentences may be imposed for convictions under the two subsections because they have been interpreted as containing different elements:

A RICO substantive charge requires proof of the existence of an enterprise which affects interstate commerce and that the defendant participated in the conduct of the enterprise's affairs by committing at least two of the designated acts of racketeering activity. A RICO conspiracy charge requires the additional element of agreement.

*United States v. Martino,* 648 F.2d 367, 383 (5th Cir.1981), *cert. denied* 456 U.S. 949, 102 S.Ct.

2020, 72 L.Ed.2d 474 (1982). In this case, however, the two charges were based on the same evidence; the government used Canale's two agreements with Provenzano to show both a conspiracy to participate in a criminal enterprise and the two predicate acts required to constitute a pattern of racketeering activity. We make no ruling on this issue but only note that the test used to determine whether double jeopardy occurs is not whether the evidence adduced at trial proves the commission of two offenses but whether the statutory elements of the offenses differ in any way. *See Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1931). "That the distinguishing element can be proven by the same evidence as that used to convict on another count does not bring the offenses within the context of double jeopardy." *Martino,* 648 F.2d at 383.

We also note the currently controversial issue of what a § 1962(d) conspiracy requires. Several courts of appeal are divided over whether a § 1962(d) violation results from a defendant's

We therefore reaffirm our view in *Welch* by holding that a conspiracy to commit an offense listed in § 1961(1)(A) may serve as a predicate act required to establish a violation of § 1962(c).

■ Canale's second argument is that he cannot be found guilty of engaging in racketeering since he was merely a consumer of Provenzano's services. Although not a member of Provenzano's organization, Canale did associate with it on two occasions. His associations furthermore incited Provenzano's organization to commit further wrongs. Mere "customers" can indeed engage in a pattern of racketeering activity in furtherance of the affairs of the enterprise. As we held earlier, Canale committed the two predicate acts needed to constitute a racketeering pattern. Once this is established, his status as a customer becomes irrelevant, because Congress intended the prosecution of anyone whose actions fall foul of § 1962(c). *See United States v. Martino,* 648 F.2d 367, 383 (5th Cir.1981), *cert. denied* 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982).

■ Because he was only an occasional customer, however, Canale was not personally involved in the crimes of the Provenzano organization perpetrated at the behest of other customers. He asserts as a ground for reversal the variance between the indictment, which alleged one conspiracy in the form of an overarching enterprise, and the trial evidence showing a group of unrelated conspiracies. This challenge to the enterprise concept cannot be taken lightly; at issue is "the right not to be tried *en masse* for the conglomeration of distinct and separate offenses committed by others." *Kotteakos v. United States,*

328 U.S. 750, 775, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946). In *United States v. Elliott,* 571 F.2d 880 (5th Cir.1978), we nevertheless held that a group of defendants could together be convicted for violating RICO even though multiple conspiracies existed. Under the enterprise concept, agreement among all conspirators is no longer necessary:

> ... [E]ach agreed to participate, directly or indirectly, in the affairs of the enterprise by committing two or more predicate crimes. Under the statute, it is irrelevant that each defendant participated in the enterprise's affairs through different, even unrelated crimes, so long as we may reasonably infer that each crime was intended to further the enterprise's affairs.

571 F.2d at 902–03. To prevent unjust association with the crimes of others, however, we required the government to show that each defendant had some knowledge of the enterprise's nature. *See id.* at 903. We expounded this requirement in *United States v. Sutherland* 656 F.2d 1181, 1192–93 (5th Cir.1981), *cert. denied* 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982):

> *Elliott* does indeed hold that on the facts of that case a series of agreements that under pre-RICO law would constitute multiple conspiracies could under RICO be tried as a single "enterprise" conspiracy. But the language of *Elliott* explains that what ties these conspiracies together is not the mere fact that they involve the same enterprise but is instead—as in any other conspiracy—an "agreement" on an overall objective.

"Agreement on an overall objective" can be proved by either an explicit agreement to

---

agreement with another that the defendant himself will commit the two predicate acts or whether an agreement that the other will do so nevertheless suffices to inculpate the defendant. *Compare United States v. Carter,* 721 F.2d 1514 (11th Cir.1984), *cert. denied sub nom. Morris v. United States,* — U.S. ——, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984) *and United States v. Adams,* 759 F.2d 1099 (3rd Cir.1985), *cert. denied* — U.S. ——, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985) (a § 1962(d) violation need not arise from an agreement that the defendant himself commit

the predicate acts) *with United States v. Ruggiero,* 726 F.2d 913, 921 (2nd Cir.1984), *cert. denied sub nom. Rabito v. United States,* — U.S. ——, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984) *and United States v. Winter,* 663 F.2d 1120, 1136 (1st Cir. 1981), *cert. denied* 460 U.S. 1011, 103 S.Ct. 1250, 75 L.Ed.2d 479 (1983) (the defendant may not be convicted under § 1962(d) unless he agrees to commit the acts himself). Because Canale did not raise this issue, we decline the opportunity to enter the fray.

participate in the enterprise or circumstantial evidence showing "that each defendant must necessarily have known that others were also conspiring to participate in the same enterprise through a pattern of racketeering activity." *Id.* at 1193.

The government failed to meet this requirement. Its brief claims that "[c]ertainly Canale (and the other "customers"), who ordered the commission of crimes, must have known that they were not alone in ordering such actions but that the enterprise depended upon persons like themselves to arrange that the enterprise undertake criminal ventures...." Because it points to no evidence in the record, however, to support this assertion, we decline to give credence to its position. This does not end the matter; the *Sutherland* analysis requires us to then inquire whether actual prejudice resulted from Canale's joinder with the other defendants. *See* 656 F.2d at 1195–97.

Our inquiry begins by acknowledging an anomaly noted by the *Sutherland* court. The multiple conspiracy doctrine can be treated as either a variance problem or a misjoinder question under Fed.R.Crim.P. 8(b). The consequences of these alternative analyses differ greatly:

> If the government indicts several defendants under a single conspiracy count and yet proves multiple conspiracies at trial, a material variance results and the defendants are each entitled to a new trial if they can show that their substantial rights were affected by the variance. *See, e.g., United States v. Elliott*, 571 F.2d at 900. If, however, the government indicts several defendants under multiple conspiracy counts (or alleges facts in the indictment that amount to multiple conspiracies) and the district court nevertheless refuses to sever the trial, the defendants are each entitled to a new trial without any showing of prejudice, for misjoinder under Rule 8(b) is inherently prejudicial (citations omitted).

*Sutherland*, 656 F.2d at 1190 n. 6 (emphasis in original). It is thus necessary to decide which inquiry is appropriate. Although the parties' briefs provide no assistance in this task, the indictment itself shows the problem to be one of variance: count one asserts the existence of a single conspiracy among those charged, while at trial no evidence imputed knowledge of the entire enterprise to Canale. Canale therefore must demonstrate actual prejudice resulting from the variance.

The record shows that Canale was not prejudiced. First, the number of conspiracies and defendants was too small to create any substantial danger of jury confusion. The evidence presented against Canale, moreover, was clearly distinct from evidence of the other crimes. Testimony of Johnny Toal and Isabelle Canale provided no occasion to confuse Canale with the other customers of the Provenzano organization. Toal, for example, explicitly indicated when he had been committing a crime on Canale's behalf. This testimony against Canale was also unquestionably strong enough to support his conviction. Its strength lessens the fear that conviction was instead based on a finding of guilt resulting from the evidence of other crimes. Finally, we note that the jury found Canale not guilty on count nine, which alleged his unlawful use of interstate communications in furtherance of a racketeering enterprise. The jury's refusal to find Canale guilty on all counts leveled against him suggests an impartial consideration of the evidence presented and the ability to discern when that evidence does not dispel its reasonable doubts of guilt. We therefore find that the variance between the indictment and the evidence does not warrant reversal.

## II. QUESTIONS OF JOINDER AND SEVERANCE

Appellants Jimenez, Manzella, and Canale argue that they should have been accorded separate trials. Jimenez asserts that the charges against him were improperly joined to those of the other defendants in violation of Fed.R.Crim.P. 8(b). All three argue that the trial court abused its discretion in refusing to sever their counts

pursuant to Fed.R.Crim.P. 14. We first note the conceptual difference between the two rules: "[t]he question of the propriety of joinder under Rule 8 and of refusal to grant relief from prejudicial joinder under Rule 14 are quite different in nature, although some decisions tend to obscure this." *United States v. Werner*, 620 F.2d 922, 926 (2nd Cir.1980). Separate attention to the two concepts is therefore appropriate.

"The key issue of misjoinder under Rule 8 is a matter of law and, as such, is completely reviewable on appeal." *Welch*, 656 F.2d at 1049. Complete review begins by recognizing what Rule 8(b) provides:

> Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Jimenez was not charged under the RICO or RICO conspiracy counts; rather, he was indicted, along with Provenzano, under 18 U.S.C. §§ 1341 and 2 for two counts of mail fraud. Facts surrounding the "theft" of Jimenez's automobile and the ensuing mail fraud are mentioned in counts one and two, however, as examples of Provenzano's pervasive pattern of racketeering.

■ We conclude that no misjoinder occurred. That Jimenez was not indicted on the RICO counts does not militate against the joinder's propriety under Rule 8(b). We have already recognized the general construction of the rule as permitting "joinder in cases where individual defendants are charged with some but not all counts of the indictment." *Welch*, 624 F.2d at 1129. Although Jimenez was not charged with participating in the enterprise, his dealings with Provenzano allowed Provenzano to further the baleful influence of his criminal organization. The mail fraud was listed as a predicate act in counts one and two, and the jury found Provenzano guilty of a racketeering pattern that included this act. Jimenez may have been a customer only once instead of the two times required for prosecution under RICO, but this difference seems a mere technicality, insufficient to prevent joinder of Jimenez with the other appellants under Rule 8(b). *See Welch*, 656 F.2d at 1052–53, *quoting Weisman*, 624 F.2d at 1129.

■ Jimenez, Manzella, and Canale argue that joinder was prejudicial under Fed. R.Crim.P. 14, which provides in part:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

Rulings under Rule 14 are reviewable only for abuse of discretion. *See, e.g., United States v. Bright*, 630 F.2d 804, 813 (5th Cir.1980). A showing of clear prejudice is therefore required before we may overrule a trial court's decision whether to sever. *See id.* The record suggests no clear prejudice. As in most RICO cases, the evidence here is both massive and complex. It was not so complicated, however, as to prevent the jury from separating the evidence and properly applying it only to those against whom it was offered. The testimony of witnesses such as Toal did not unduly confuse the identities of the appellants, and complete, coherent cases were made out against each. The trial court, moreover, explicitly instructed the jury to consider each offense separately and each defendant individually.[3] No abuse of dis-

---

3. The judge gave the following instruction:
 A separate crime or offense is charged against one or more of the defendants in each count of the indictment. Each offense, and the evidence pertaining to it, should be considered

separately. Also, the case of each defendant should be considered separately and individually. The fact that you may find one or more of the accused guilty or not guilty of any of the offenses charged should not control your

cretion appears. *See Peterson v. United States,* 344 F.2d 419, 422 (5th Cir.1965), *quoted in Welch,* 656 F.2d at 1053–54.

### III. MIDTRIAL PUBLICITY

We now consider the arguments of several appellants regarding publicity occurring during the trial. These focus on two newspaper articles, both mentioning Joseph Provenzano's prior conviction for assaulting a government witness.

On Monday, December 3, 1984, this trial began in a New Orleans district court. The jurors were selected at that time but had received no instruction to avoid media coverage before an article ran on the first page of The Times-Picayune's metro section on the morning of Wednesday, December 5. In discussing the facts of this case, the article briefly mentioned Provenzano's January 1984 conviction for assaulting a government witness, one John Rietzke, after Rietzke had testified before a grand jury investigating Provenzano. This information of a prior conviction, of course, would be unduly prejudicial and inadmissible as trial evidence. In a meeting between the trial judge and the parties' counsel, Provenzano's lawyer asked for a voir dire of the jury and, alternatively, for a mistrial. Instead the judge addressed the jury, delivering a strong, lengthy warning to avoid media coverage of the trial. He then asked the jurors if they had seen the article. Three jurors responded affirmatively and were individually interrogated. In interviewing the first juror, Valerie Bailey, the judge asked whether she had noticed any reference to Provenzano's conviction; upon her negative reply, she was returned to the jury. Discussions with the other two jurors did not include specific mention of the conviction, and after the judge questioned the three he resumed the trial. On the next day, however, both judge and counsel questioned Mrs. Bailey again, this time about conversations with the other jurors after the previous day's questioning. She said that her talks with the others had been in general terms and verdict as to any other offense or any other

without reference to the conviction. The judge nevertheless excused her, recalled the jury, and again warned it about avoiding trial publicity.

■ Two troubling points emerge from these facts. First, two members who saw the article remained on the jury. While both jurors firmly asserted their continued impartiality, their beliefs are not dispositive:

> The fact that the two jurors said they could disregard the newscast and decide the case solely on the evidence adduced in court is not controlling.... The effect of exposure to extrajudicial reports on a juror's deliberations may be substantial even though it is not perceived by the juror himself, and a juror's good faith cannot counter this effect.

*United States v. Williams,* 568 F.2d 464, 471 (5th Cir.1978). We nevertheless conclude that their exposure to the article was not harmful because they showed no remembrance of reference to a prior conviction. They said that they only glanced at the lengthy article and that they gleaned from it only facts already brought out at trial. Failure to see reference to Provenzano's earlier conviction would be completely understandable, moreover, because discussion of the conviction occupied but one short paragraph in a lengthy article. Other, much more detailed passages chronicling the trial's progression dominated the article. One glancing casually at the news item could easily have overlooked mention of the conviction.

This case therefore differs from *Williams.* We reversed the convictions there because jurors saw a television newscast mentioning defendants' prior convictions. Unlike the situation here, however, "it seems clear that they heard of the prior trial and its result." 568 F.2d at 466. We lack this certainty; to the contrary, the jurors' responses indicate no recollection of any mention of Provenzano's earlier conviction. *Williams* therefore does not prohibit defendant.

us from concluding that the retention of these two jurors is no ground for reversal.

█ A second problem exists, however, because the trial judge mentioned the conviction in interviewing juror Bailey and then sent her back to the jury. Her return with knowledge of the conviction gleaned from the judge's questioning created the possibility of jury contamination. Fortunately, the subsequent interview with her dissipated this possibility, her comments indicating the absence of contamination.[4] Although some ambiguity appears in the record, we are satisfied that Mrs. Bailey did not mention the conviction to the other jurors. While we may not deem as controlling a juror's insistence of impartiality, we have no reason to doubt the truth of her factual assertions about what she told the other jurors or the trial court's implicit acceptance of them as accurate, let alone to view them as establishing the negative of what she said.

On Wednesday, December 12, the front page of The Times-Picayune's metro section contained another article that referred to Provenzano's prior conviction. As it happens, John Rietzke, the assault victim, was to testify on that day. Counsel requested another jury voir dire, but the judge disregarded the request, instead again advising the jury to avoid reading the newspaper coverage of the trial. Failure to conduct a voir dire makes this a more troubling incident, yet we again conclude that reversal is inappropriate.

In *United States v. Herring,* 568 F.2d 1099 (5th Cir.1978), we laid down a formula for determining whether a voir dire is required because of midtrial publicity. The *Herring* court adopted the American Bar Association's recommendation of requiring a voir dire should there arise "serious questions of possible prejudice." 568 F.2d at 1104, *quoting* ABA Standards Relating to Fair Trial and Free Press § 3.5(f) (1968). It then delineated a two-part inquiry devised to answer whether such "serious questions" exist. A court must first look at the nature of the news material in question to determine whether it is innately prejudicial; factors such as the timing of the media coverage and its possible effects on legal defenses are to be considered. *Id.* Second, the court must ascertain the likelihood that the publicity has in fact reached the jury. The prominence of the media coverage and the nature and number of warnings against viewing the coverage become relevant at this stage of the inquiry. *Id.* at 1105; *see also United States v. Harrelson,* 754 F.2d 1153, 1162–64 (5th Cir. 1985).

4. The conversation occurred as follows:

THE COURT: Mrs. Bailey, yesterday I asked a couple of questions about the article in the newspaper concerning certain aspects of the case as it was mentioned in the newspaper. Did you in any way discuss any questioning of that with the other members of the jury?
JUROR BAILEY: Well, they asked me what you said and I told them what you asked about the paper.
THE COURT: That's all, that I asked about the article in the paper?
JUROR BAILEY: In the paper.
THE COURT: That was the extent of your response to them?
JUROR BAILEY: Yes, that was it.
THE COURT: Anybody else have any questions they want to put to the juror with respect to that?
MR. CAPITELLI: Did you, as far as that discussion was concerned, go into any particular detail about the article, in particular what was in the article?

JUROR BAILEY: No, no more than when someone mentioned that the article was in the paper and most of them said they didn't see it so I said I saw it and another lady said she saw it and that was it and nobody discussed what went on in the paper.
MR. CAPITELLI: Thank you.
MR. HAND: I have one question. Did you, after you had spoken with the judge when the judge brought you in by yourself and asked you some questions, did you discuss with those jurors any of the questions which the Court had asked you?
JUROR BAILEY: No. Not what he asked me, they asked me what he asked me and I said about the article.
MR. HAND: What it was about the article that was the article in the paper (sic)?
THE COURT: Okay, Mrs. Bailey. Because of some technical problems that certain attorneys thinks are existent in the matters with respect to the procedures that were followed in connection with the article, I am obliged to excuse you....

In *Herring*, the trial court's failure to conduct a voir dire after the local newspaper had exposed the existence of death threats against a key prosecution witness led the panel to reverse the conviction:

... [W]e have before us yet another situation in which a presumption of prejudice is appropriate for appellate purposes. The inferences which would naturally flow from the appearance of the newspaper issue in question, coupled with a sound regard for the sanctity of the jury system, lead us to presume that some prejudice of impermissible dimension did in fact exist in the jury room when the verdict in this case was decided. We think this presumption is required in light of the district court's refusal to inquire into the matter when the defense requested that course of action; as a result of that refusal, there is nothing on the record before us to indicate that the defendant's guilt was not impermissibly prejudiced.

568 F.2d at 1103–04. A much different view appears in *United States v. Ricardo*, 619 F.2d 1124 (5th Cir.1980), *cert. denied* 449 U.S. 1063, 101 S.Ct. 789, 66 L.Ed.2d 607 (1980). During a retrial of criminal defendants a local newspaper mentioned the former trial and the defendants' convictions. The trial court, however, denied a motion to individually voir dire the jury. Despite this denial, we affirmed the new convictions and refused to presume prejudice against the defendants. Affirmation resulted because there was "no showing that they were actually prejudiced by the various accounts of the trial proceedings." *Id.* at 1132–32 (emphasis added). These pronouncements are facially not easily reconciled, but they are explained by the factual differences between the two cases. The *Herring* court stressed the prominence of the newspaper article; "the headlines, photograph, and article appeared on the front page of Macon's leading morning paper." 568 F.2d at 1103. By contrast, the *Ricardo* court was apparently unimpressed with the scope of the media coverage. Appellants there provided no evidence to rebut the view that "[t]his case did not contain the

pervasive influence of the news media...." 619 F.2d at 1132. Despite the facially different rulings, both decisions rest upon an estimation of the chances of media influence over the jurors in the absence of individual questioning. We must now estimate again.

■ Because this case is closer to *Ricardo* than to *Herring* on the facts, we affirm Provenzano's conviction despite the court's failure to voir dire the jury on December 12. Unquestionably, reference to his prior conviction is prejudicial, but we see the chances of its actual influence over the jury's decision-making as miniscule. The court had warned the jury against reading about the trial at least twice before December 12. While these warnings were not in the strongest terms imaginable, they nevertheless appear sufficient to impress upon the juror's minds the need to avoid media coverage. The December 12 article was no headline item of the Times-Picayune, although it did appear on the first page of an interior section. The inadmissible information—the prior conviction—again constituted one small paragraph at the end of the medium-length article.

This case's similarity to *Ricardo* requires Provenzano to show actual prejudice resulting from the article to obtain a reversal. The jury's decisions, however, belie any likelihood of such prejudice. The indictment leveled ten counts against Provenzano, but he was found not guilty of using interstate communications in furtherance of illegal racketeering as charged in counts eight and nine. The jury's ability to discern Provenzano's innocence of some of the alleged crimes indicates a fair-minded consideration of the case against him. The not guilty verdicts reinforce our belief that the media coverage did not lead to the deprivation of Provenzano's right to an impartial jury.

■ Appellants Crabtree and Canale also seek reversal on the basis of the media coverage but their attempts are even weaker than Provenzano's. Neither was the subject of the article, and the publicity of

544

Provenzano's earlier conviction is not as likely to be taken as probative of their guilt. In *United States v. Schrimsher*, 493 F.2d 848 (5th Cir.1974), midtrial publicity concerned the jailing of defendant's lawyer for contempt. Five jurors saw the report of this but were allowed to remain on the jury. The conviction was affirmed because no undue prejudice resulted; "[t]here was little reference to Schrimsher and what reference there was in no way reflected upon his guilt or innocence on the wiretapping charge." *Id.* at 854. Because the situation here is similar, the *Schrimsher* reasoning leads us to reject appellants' argument.

## IV. CO–CONSPIRATOR ADMISSIONS

The co-conspirator exclusion to the hearsay definition, Fed.R.Evid. 801(d)(2), is an issue here because much of the government's evidence was the testimony and out-of-court conversations of John Toal and Rondell Hulbert. Having assisted in the various crimes of the Provenzano organization, they became informants and greatly helped the government collect evidence. Both agreed to carry hidden microphones and engaged in taped conversations with several of the appellants. Both testified at trial, moreover, thoroughly describing the organization's various crimes.

Several appellants challenge the admissibility of the testimony and tapes, the most extensive challenge coming from appellant Crabtree. We briefly examine the evidence of his involvement to better understand his claims. Toal testified that he and Provenzano met with Crabtree in late 1979 and were told that appellant Thibodaux wanted the Oil Patch Lounge in Bayou Blue, Louisiana, burned down. Provenzano reportedly assured Crabtree that he would take care of things and eventually told Hulbert to destroy the building. Although fire severely damaged the lounge on December 31, 1979, its owner began to rebuild. Hulbert testified that, shortly after the fire, Crabtree expressed disappointment that total destruction had not occurred. Hulbert also recollected meeting at Crabtree's house with Thibodaux, Crabtree, and Pro-

venzano, at which time Provenzano apparently did all the talking. Told to burn the Oil Patch again, Hulbert and appellant Blanchard successfully complied. After the lounge's complete destruction by the second fire, Provenzano and Hulbert drove to a truck stop owned by Crabtree and Thibodaux. Crabtree was there alone and asked whether they had come for the money owed. Thibodaux later appeared and paid the two.

Toal and Hulbert also repeated other appellants' statements that suggested Crabtree's complicity. Toal testified that after the first fire Thibodaux had asserted both that payment was made to Provenzano and that Crabtree was the source of the funds. Hulbert recollected Provenzano's claim that Crabtree was financing their services. Hulbert later bickered with Provenzano over payment for the first arson and Provenzano asserted that he would make Crabtree come over and declare that Provenzano had not been paid. Although these are all out of court statements, they are not hearsay because they come from co-conspirators speaking during the course of the continuing enterprise. Fed.R.Evid. 801(d)(2). Even though co-conspirators statements fall outside the realm of hearsay, however, their admissibility does not automatically follow. There still must be a determination that a conspiracy in fact existed and that both the declarant and the defendant against whom the statement was made were members at that time.

United States v. James, 590 F.2d 575 (5th Cir.1979) (en banc) *cert. denied* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979) guides us in making these determinations. A judge may admit a declaration by one conspirator against others only after "a sufficient showing, by independent evidence, of a conspiracy among one or more other defendants and the declarant and if the declarations at issue were in furtherance of that conspiracy." *Id.* at 581, *quoting United States v. Nixon*, 418 U.S. 683, 701, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974). A sufficient showing is made by "substantial, independent evi-

dence of a conspiracy at least enough to take the question to the jury." *Id., quoting Nixon*, 418 U.S. at 701 n. 14, 94 S.Ct. at 3104 n. 14. Despite appellants' contrary assertions, *James* does not require the trial court to hold a pre-trial hearing for this determination. *United States v. Montemayor*, 703 F.2d 109, 117 (5th Cir.1983), *cert. denied* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983). A court should require independent evidence of a conspiracy's existence before the co-conspirator's statements are admitted into evidence. *James*, 590 F.2d at 582. Even this is not required, however; the trial court has "discretion to determine the application of the *James* ruling and rationale in the specifics of the trial setting encountered." *United States v. Whitley*, 670 F.2d 617, 620 (5th Cir.1982).

■ The issue here is whether the government presented "substantial independent evidence" of the enterprise's existence and of Crabtree's involvement in the arsons. Because the record clearly reveals overwhelming evidence of the enterprise's existence, our scrutiny must focus on Crabtree's involvement. Before the first fire, he told Provenzano and Toal that Thibodaux wanted the Oil Patch burned down. After the fire, he expressed disappointment at the lack of total success. After the second fire, Crabtree reportedly inquired whether Provenzano and Hulbert had come to the truckstop to receive the money. Recollections of these statements are excluded from the definition of hearsay, not because of the co-conspirator exception, but because they are direct party admissions. Since *James* affects the admissibility of co-conspirator statements only, party admissions may come in and serve as independent evidence. *See United States v. Zielie*, 734 F.2d 1447, 1457 (11th Cir.1984), *cert. denied* — U.S. —, 105 S.Ct. 1192, 84 L.Ed.2d 338 (1985).

■ The June 1980 meeting at Crabtree's house also provides independent evidence of Crabtree's complicity. Hulbert testified that Crabtree said nothing at this meeting; rather, he sat quietly as Provenzano told Hulbert to commit the second

arson. His silence is incriminating, however, because opposition to the scheme should have provoked protest in this situation. An innocent man would not let others sit in his house and plan arson. By his silence, Crabtree therefore adopted Provenzano's words. *See United States v. Villarreal*, 764 F.2d 1048, 1051 (5th Cir.1985), *cert. denied* — U.S. —, 106 S.Ct. 272, 88 L.Ed.2d 233 (1985). Adoptive admissions are another exclusion from the hearsay definition, also distinct from the co-conspirator exclusion. They too may therefore qualify as the independent evidence necessary to allow the admission into evidence of co-conspirator statements. *See United States v. Carter*, 760 F.2d 1568, 1580–81 (11th Cir.1985).

■ Both Manzella and Blanchard argue that taped conversations between Toal and Hulbert, on the one hand, and various appellants, on the other, should not have been admitted into evidence. Because they occurred after Toal and Hulbert began cooperating with the government, the statements were not made in furtherance of a continuing conspiracy. Appellants, however, misperceive the rationales for the tapes' admission. Direct party admissions are contained on several tapes, admissions that do not depend on the conspiracy's continued existence. Other tapes were introduced under the prior consistent statement exclusion. See Fed.R.Evid. 801(d)(1). While the status of Toal and Hulbert as government informants removes their subsequent statements from the coverage of the co-conspirator statement exclusion, those conversations were nevertheless properly admitted into evidence.

■ Finally, we note the requirement of *James* that the trial court determine at the conclusion of the evidence whether the government has met the burden of presenting independent evidence of the conspiracy's existence. 590 F.2d at 582. The judge, however, need not delineate his findings for the benefit of counsel as long as the record indicates careful consideration of his responsibility. *See United States v. Winship*, 724 F.2d 1116, 1121 (5th Cir.

1984). The record here shows such consideration. At the close of the case, the judge explicitly determined that the evidence presented was sufficient to let the case against all defendants go to the jury. Appellants thus obtain no support from the law of co-conspirator admissions; the introduction of the evidence described was proper.

## V. THE ENTRAPMENT DEFENSE

 Jimenez argued at trial that the government entrapped him into committing the mail fraud. In making this argument, he conceded the intentional commission of the fraud. This concession is not required for the entrapment defense; one need not admit criminal intent. *See United States v. Henry,* 749 F.2d 203, 213 (5th Cir.1984) (en banc). On appeal, he argues that this concession resulted from his desire to prohibit the introduction of extrinsic evidence concerning past crimes. The extrinsic evidence came in anyway, thereby providing Jimenez with another ground of appeal.

Jimenez apparently believes that if intent is not made an issue the probative value of extrinsic evidence evaporates. This belief is erroneous, however, because two questions are involved:

> ... [E]ntrapment is a focus on predisposition—the origin of the criminal intent in issue. Whether the defendant had the criminal intent required for conviction is a jury issue. Whether he was predisposed to commit the charged crime, i.e., whether ... one can say that the criminal intent or design originated with government agents, is also a jury issue.

*Henry,* 749 F.2d at 213. Conceding intent resolves only the first of these. Still at issue is whether the government incited him to defraud his insurance company. Extrinsic evidence of prior crimes is logically relevant in resolving this issue because it suggests Jimenez's predisposition to commit mail fraud regardless of government influence. Such evidence, moreover, is not unduly prejudicial in a case such as this. When entrapment is raised as a defense, the criminal defendant makes his own character an essential trial issue. The government may therefore introduce proof of his prior wrongs. Fed.R.Evid. 405(b).[5]

His fallback position is that this evidence is irrelevant because it does not demonstrate the *mens rea* needed to commit mail fraud. An essential element of 18 U.S.C. § 1341 is the intent to defraud, which Jimenez regards as a special category of intent, different from that shown by the extrinsic wrongs, which were schemes to sell a stolen watch and to steal credit cards. We regard this distinction as too artificial to bar the admission of evidence regarding those past misdoings. Although the statutory elements of the extrinsic offenses differ from those of mail fraud, they are really quite similar in nature. Because they involved theft and deceit, his past crimes suggest that he is the type of person who would show little hesitation in defrauding his insurance company. Allowing this extrinsic evidence to come in was therefore proper.

## VI. FINAL MATTERS

 We conclude by looking at some odds and ends. Canale argues that the trial court erred in allowing the government to impeach him on cross examination with testimony about a prior nolo contendere plea. Evidence of a *nolo* plea is inadmissible. Fed.R.Evid. 410. Because Canale's counsel made no objection based on Rule 410, however, he faces a severely limited standard of review. As a rule, we consider only matters first raised in the trial court. *United States v. Grapp,* 653 F.2d 189, 194 (5th Cir.1981). The decision to review is usually a matter of our discretion. *United States v. Parker,* 722 F.2d 179, 183 n. 2 (5th Cir.1983), *citing Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49

---

5. Jimenez points to Fed.R.Evid. 404(b) to support his argument that evidence of prior wrongs is inadmissible if intent is no longer an issue. His argument fails, however, because Rule 404 does not apply in a case in which one's character is "an essential element of a charge, claim, or defense." Only Rule 405(b) takes into account such cases.

L.Ed.2d 826 (1976). The Supreme Court, however, requires consideration of errors not raised below in criminal cases if the errors seriously affect the fairness or integrity of judicial proceedings. *Anderson v. United States*, 417 U.S. 211, 217 n. 5, 94 S.Ct. 2253, 2258 n. 5, 41 L.Ed.2d 20 (1974).

We face no such challenge to judicial integrity here. Before he was questioned about the nolo contendere plea, Canale had already admitted the conduct that formed the basis of it. The additional fact of the plea thus added little to what the jury already knew. Further, the trial judge instructed the jury to consider only those crimes alleged in the indictment. Because we find no travesty of justice resulting from this erroneous admission, we decline to reverse Canale's convictions.

Blanchard claims undue prejudice resulted from a tape recording of a conversation he had with government informants Toal and Hulbert. Having uttered ugly racial epithets during the conversation, he now claims this could only improperly influence the four black members of the jury. It would have been preferable had this part of the conversation been edited out, especially since it did not concern any past wrongdoing. Blanchard's claim is nevertheless insufficient cause for reversal because of clear jury instructions to disregard the racial statements. *See Bright*, 630 F.2d at 814.

The appellants posit other grounds for reversal, but these lack sufficient merit to justify discussion here. We now take the opportunity to urge the district courts to take an active supervisory role in cases such as this. A RICO case is an unusually complex criminal proceeding, providing many possibilities of confusion and ambiguity. The trial judge must therefore strive to ensure that both the jury and counsel are not overwhelmed by the details involved. While ours is an adversarial system, there must be a referee to make clear the rules of the game, and his role becomes more important when these rules are as complicated as in a RICO trial. Having said so much, we find that no reversible errors occurred below; the convictions are therefore

AFFIRMED.