IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 91-8263

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CHARLES ROLAND ARAGON, ROSS
MARTINEZ, AND RONALD EUGENE
LEVI,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Western District of Texas
_____

( May 26, 1992 )

Before WILLIAMS, JOLLY, and HIGGINBOTHAM, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Appellants, Charles Ronald Aragon, Ross Martinez, and Ronald
Eugene Levi, along with six co-defendants not subject to this
appeal, were charged in an eight-count indictment for their
participation in a pipeline organization which smuggled marihuana
to Washington, D.C., and Canada, using El Paso and Albuquerque as
shipment points.  After a jury trial, Aragon, Martinez and Levi
were each found guilty of willfully and knowingly conspiring to
possess more than 100 kilograms of marihuana with intent to
distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846 (count
1). Aragon and Levi were also found guilty of knowingly and

intentionally possessing more than 100 kilograms of marihuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (count 2).  Additionally, Levi was found guilty of possessing a firearm during and in relation to a drug-trafficking crime in violation of 18 U.S.C. § 924(c)(1) (count 5).  Further, the jury found Aragon guilty of knowingly conducting and attempting to conduct a financial transaction with the proceeds of an unlawful drug transaction in violation of 18 U.S.C. §§ 2 and 1956(a)(1)(A)(i), and found Levi guilty of aiding and abetting the commission of that offense in violation of 18 U.S.C. § 2 (count 8).  The district court, however, granted Aragon and Levi's motion for acquittal on count 8.

Appellants contend that the trial court committed reversible error in refusing to poll the jury regarding the possible prejudicial effect of a newspaper article appearing after jury empaneling at the commencement of the trial.  The specific assertion of error is the failure of the court to ascertain what information, if any, the jurors received, and if they were exposed to extra-record information, so that the court could make a finding on its prejudicial effect.  In this case a specific and detailed newspaper article about the defendants and their activities was published on the front page of the Metro section of the most widely circulated local paper in El Paso.  We must conclude that the district court's failure to act decisively to ascertain the impact of the article on the jury constituted an abuse of discretion.  At a minimum, when the trial court was

apprised of the existence of this potentially prejudicial article it should have made the proper inquiries of the jury.  Under the necessary auspices of guarding against the effect of prejudicial newspaper publicity, and under the exercise of our supervisory power,[1] we reverse for a new trial.[2]


I.  Publicity During Trial

On the first morning of the two-day trial, the El Paso Herald-Post published an article with a conspicuous double headline: "Pot trial begins for senator's brother/ Men accused of smuggling through city."[3]  The article set out Aragon's familial relationship

---

[1]  This case, under well established precedent of United States v. Attell, 655 F.2d 703 (5th Cir. 1981), United States v. Williams, 568 F.2d 464 (5th Cir. 1978), and United States v. Herring, 568 F.2d 1099 (5th Cir. 1978), is a direct appeal of a federal criminal conviction; and our review is predicated upon our supervisory power over the district courts.  See, e.g., United States v. Marshall, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959) (per curiam).

[2]  Our reversal of the appellants' convictions on prejudicial publicity grounds renders consideration of their other points of error--Bruton violations, Brady violations, failure to submit requested jury instructions, and insufficiency of the evidence--unnecessary.

[3]  Two broad classes of prejudicial publicity cases exist. The first category includes those massive pretrial publicity "media circus" cases (though often with extensive coverage of the trial itself) typically necessitating a change of venue because of extreme prejudice and inflamed community atmosphere. See, e.g., Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Estes v. Texas , 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963).  The standards governing a change of venue ultimately derive from the due process clause of the Fourteenth Amendment which safeguards a defendant's Sixth Amendment right to be tried by "a panel of impartial, `indifferent' jurors."  Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961).  The second category of

3

to a New Mexico State Senator as well as his "history" of drug arrests and convictions dating to the early 1970's.  It also recounted the appellants' alleged boasting of the smuggling of thirty-two tons of marihuana through an El Paso marihuana smuggling pipeline and of their earlier dealings with a reputed "narcotics kingpin" Gilberto Ontiveros.[4]  According to the appellants, the

cases primarily involves publicity that occurs during the trial, necessitating a poll of the jury to determine whether "a significant possibility of prejudice" exists.  The Supreme Court has examined this kind of publicity in the context of its "supervisory power to formulate and apply proper standards for enforcement of the criminal law in the federal courts,"  Marshall v. United States, 360 U.S. 310, 313, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250 (1959) (per curiam), "and not as a matter of constitutional compulsion."  Murphy v. Florida, 421 U.S. 794, 797, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975). No contention has been made that this case falls under the rubric of the first category of cases.  Finally, this Court has recognized a stricter standard for mid-trial publicity breaches, such as alleged here, than pretrial ones.  See, e.g., United States v. Williams, 568 F.2d 464, 468 (5th Cir. 1978) (noting that "information reported during the trial seems far more likely to remain in the mind of a juror exposed to it, and he may be more inclined to seek out this information when he is personally involved in the case"); in accord United States v. Harrelson, 754 F.2d 1153, 1163 (5th Cir.), cert. denied, 474 U.S. 908, 106 S.Ct. 277, 88 L.Ed.2d 241, and cert. denied, 474 U.S. 1034, 106 S.Ct. 599, 88 L.Ed.2d 578 (1985).

[4]  The full newspaper report read:

The brother of a New Mexico state senator and two other men accused of marijuana trafficking go on trial in El Paso today.
The men are suspected of smuggling 32 tons of marijuana through El Paso during the year before their arrest.
Charles Ronald Aragon, 35, the brother of New Mexico state Senate President Pro Tem Manuel Aragon, was arrested in Las Vegas, Nev., in December after investigators linked him to an El Paso marijuana-smuggling pipeline.
Charles Aragon, whose father is a former Albuquerque city councilman and former member of the New Mexico Board of Pardons, has a history of drug-related arrests and convictions going back to the early 1970s.
His latest arrest stemmed from an investigation by the West Texas Multi-County Task Force and the FBI in October in which

4

inflammatory newspaper article contained information which clearly

went beyond the record.[5]   It portrayed Aragon as an established

undercover agents sold 245 pounds of marijuana to an El Paso
couple.
    Seven people were arrested that day, and several later
cooperated in an expanded investigation, implicating Aragon, who
was living in Las Vegas under an assumed name.
    Also set to go on trial before U.S. District Judge Lucius
Bunton are Ross Martinez, 38, of Los Lunas, N.M., and Ronald
Eugene Levi, 50, of Albuquerque.
    The men were charged in an El Paso grand-jury indictment of
possessing more than 200 pounds of marijuana, conspiracy to
possess the marijuana, and money-laundering.
    El Paso FBI spokesman Terry Kincaid said earlier that
members of the alleged marijuana-smuggling ring had boasted of
smuggling 32 tons of marijuana a year earlier to Washington,
D.C., and Canada using El Paso and Albuquerque as shipment
points.
    They had also boasted of having earlier dealings with
reputed Juarez narcotics kingpin Gilberto Ontiveros.
    If convicted, the men face sentences of five to 40 years in
federal prison and fines of up to $5 million.
    Levi, a retired Air Force sergeant, was one of seven people
arrested in October in El Paso.  Also arrested were John Francis
Thomas Dempsey, 44, of Albuquerque, Harry Fortson, 59, and his
wife, Guadalupe, of El Paso; Timothy Jasper Rinard, 38, and his
wife, Alma, 31, of El Paso; and John Morris Mustaffa, 29, of
Buena Park, Calif.

El Paso Herald-Post
February 19, 1991

    [5]  The government asserts that Aragon brought forward for
the first time on appeal the argument that the trial court erred
in failing to voir dire the jury concerning this mid-trial
publicity.  We carried with the case a motion by the government
to strike appellant Aragon's brief on this issue.  Aragon
acknowledges the law in this circuit concerning the untimely
raising of issues. See, e.g., United States v. Sherbak, 950 F.2d
1095, 1101 (5th Cir. 1992) (per curiam) (citation omitted)
(stating that "issues raised for the first time on appeal `are
not reviewable by this Court unless they involve purely legal
questions and failure to consider them would result in manifest
injustice'").  In this case, however, Aragon officially adopted
as his own the mid-trial publicity issue raised in Martinez'
brief.  Moreover, Aragon's counsel first raised the issue at the
trial.  With regard to Levi, although he did not raise this
argument in his briefs, his counsel at trial also joined the
motion for additional voir dire.  Thus, in contrast to the

5

drug dealer with a prior criminal history, a portrayal unquestionably prejudicial to Aragon. Further, since Martinez, Levi, and Aragon were charged as co-conspirators, it blackened Martinez' and Levi's reputations as well. Given Aragon's criminal history of arrests and convictions, the jury would necessarily tend to believe that Martinez and Levi must have known about Aragon's earlier criminal undertakings. Additionally, according to appellants, the allegations of the purported dealings with the "narcotics kingpin" Gilberto Ontiveros were devastating and highly prejudicial. The Ontiveros crime family has great notoriety in El Paso and has been the subject of many articles.[6]

On the morning of the commencement of trial, the jury having already been empaneled, counsel for the appellants requested that the court conduct additional voir dire to ascertain whether any juror had read or heard of the article. Despite the highly prejudicial nature of the publicity involved, the trial court squarely denied the defense counsel's request for a poll. Without

government's contention, we treat the mid-trial publicity argument as brought properly before us as to all three appellants. We deny the government's motion to strike Aragon's brief.

[6] The government unsuccessfully attempts to argue that Martinez and Levi are mentioned in the article only in the context of being set for trial; therefore, they clearly cannot assert prejudicial impact of the article. We find this argument unavailing. The article stated that "members of the alleged marijuana-smuggling ring had boasted of smuggling 32 tons of marihuana." A reader could readily presume that the newspaper was referring to Aragon, Levi, and Martinez, since the names of the other arrestees were not mentioned until the end of the article. A similar conclusion may be drawn from the statement that "[t]hey had also boasted of having earlier dealings with reputed Juarez narcotics kingpin Gilberto Ontiveros."

even a cursory glance at the newspaper article, the court said: "Hand it to the clerk right here. Your request is denied. Anything else? I don't see it, I don't need the paper. I am like the jurors. They don't read the paper either. I told them not to."[7]

---

[7] Our review of this record shows that the trial court had not told the jurors not to read the newspaper. But the trial court had admonished the jury they should avoid any newspaper accounts of the trial.

The exchanges relevant to this issue are as follows:

Jury Voir Dire:

    THE COURT: Don't read anything, if there is an account of this in the newspaper, don't read anything about it. If there is something on television, don't watch it. If there is something on the radio, don't listen.

                        . . .

Proceedings First Day of Trial:

    THE COURT: Good morning. What is our problem this morning?

    MR. CHESNOFF: A minor one, Your Honor, but if I could make this newspaper article part of the record and ask the Court to conduct some additional voir dire this morning. I think that the source is quoted in the source which is very inflammatory are FBI agents, members of the prosecution team. And for that reason, I ask the Court to conduct some additional voir dire to see whether or not they have been prejudiced in any way or became aware of this article. If I could approach the clerk, Your Honor, so this could be made part of the record.

    THE COURT: Hand it to the clerk right here. Your request is denied. Anything else? I don't see it, I don't need the paper. I am like the jurors. They don't read the paper either. I told them not to.

                        . . .

    THE COURT: Members of the Jury, it is just almost 12:00. We will stand recess as far as you are concerned until 1:30. Please don't read anything about this, don't watch anything about it, I don't think you will be watching television. You would

7

## II. Possible Prejudice - Court Discretion

The standard for review of the exercise of the district court's discretion in a case such as this is abuse of that discretion. <u>United States v. Harrelson</u>, 754 F.2d 1153, 1163 (5th Cir.), <u>cert. denied</u>, 474 U.S. 908, 106 S.Ct. 277, 88 L.Ed.2d 241, and <u>cert. denied</u>, 474 U.S. 1034, 106 S.Ct. 599, 88 L.Ed.2d 578 (1985). The trial judge has broad discretion in ruling on the issue of prejudice resulting from a jury's exposure to news articles concerning a trial. <u>United States v. Marshall</u>, 360 U.S. 310, 312, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250 (1959) (per curiam). Further, "[i]t is for the trial judge to decide at the threshold whether news accounts are actually prejudicial; whether the jurors were probably exposed to the publicity; and whether jurors would be sufficiently influenced by bench instructions alone to disregard the publicity." <u>Gordon v. United States</u>, 438 F.2d 858, 873 (5th Cir.), <u>cert. denied</u>, 404 U.S. 828, 92 S.Ct. 139, 30 L.Ed.2d 56, and <u>cert. denied</u>, 404 U.S. 828, 92 S.Ct. 140, 30 L.Ed.2d 56 (1971).

---

probably be watching As the World Turns or something, if they have anything about this trial, don't watch it.

. . .

THE COURT: Now, I have not seen tonight's paper, I have not, obviously have not seen the morning's paper, I don't know whether there has been anybody in here sweating it out for the press or not. If there is an account of it in the newspaper, do not read it. There will be plenty about the Persian Gulf on there for you to read, and you can read that, because that doesn't have anything to do with this case. There probably will be something about the UTEP basketball team on there. You can read that, I encourage you to. There is probably going to be some funny papers that don't have anything with this. Read those tomorrow before you come. Don't read anything about this case.

8

Our role must emerge in this case, however, because the trial court has not made any of these determinations.

The formula for determining if a voir dire is required because of mid-trial publicity is stated in United States v. Herring, 568 F.2d 1099 (5th Cir. 1978). We held that a voir dire is required if there could arise "serious questions of possible prejudice."[8]  We

[8]  Though Herring is generally considered to be our leading case delineating the requisite standard, earlier statements as to this inquiry exist.  In Adjmi v. United States, 346 F.2d 654, 659 (5th Cir.), cert. denied, 382 U.S. 823, 86 S.Ct. 54, 15 L.Ed.2d 69, and cert. denied, 382 U.S. 823, 86 S.Ct. 73, 15 L.Ed.2d 69 (1965), we said:  "When during the course of the trial[,] counsel for the appellants brought to the court's attention the prejudicial newspaper accounts and moved for a mistrial, the court had a duty to inquire whether the articles had created prejudice in the minds of the jurors."  In contrast to the instant case, the court in Adjmi, upon the counsel's request, inquired whether any of the jurors had read the newspaper accounts about the trial.  The court thus satisfied its obligation to inquire.  In Gordon v. United States, 438 F.2d 858, 873 (5th Cir.), cert. denied, 404 U.S. 828, 92 S.Ct. 139, 30 L.Ed.2d 56, and cert. denied, 404 U.S. 828, 92 S.Ct. 140, 30 L.Ed.2d 56 (1971), in addressing mid-trial  publicity, we set out relevant factors for the trial court to consider in determining whether news accounts are actually prejudicial:  "(1) the character or nature of the information published . . . ; (2) the time of the publication in relation to the trial; (3) the credibility of the source to which the information is attributable[;] and (4) the pervasiveness of the publicity, that is, the extent of the audience reached by the media employed and the interest evoked."  In Gordon, on the day the jury was empaneled, an article which consisted largely of a routine account of the factual events of the trial appeared in a widely circulated local newspaper.  Upon appellants' request to poll the jury to ascertain their exposure to the article, the court read the article and ruled that it was not prejudicial.  Gordon is distinguishable from this case in a crucial aspect--there the court performed the proper inquiry.  In United States v. Hyde, 448 F.2d 815, 848 n.38 (5th Cir. 1971), cert. denied, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745, and cert. denied, 404 U.S. 1058, 92 S.Ct. 737, 30 L.Ed.2d 745 (1972), this Court reiterated the necessary query:  "[W]hen there has been publicity that would possibly prejudice the defendant's case if it reached the jurors, the court should first ask the jurors what information they have received.  Then it should ask about the prejudicial effect and it

9

then set out a two-step inquiry devised to answer whether such "serious questions" exist. First, the district court must look at the nature of the news material to determine whether the material is innately prejudicial. Factors such as the timing of the media coverage, its possible effects on legal defenses, and the character of the material disseminated merit consideration. Second, the court must then discern the probability that the publicity has in fact reached the jury. At this juncture, the prominence of the media coverage and the nature, number, and regularity of warnings against viewing the coverage become relevant. 568 F.2d at 1104-05. See also United States v. Arzola-Amaya, 867 F.2d 1504, 1513 (5th Cir.), cert. denied, 493 U.S. 933, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989); United States v. Manzella, 782 F.2d 533, 542 (5th Cir.), cert. denied, 476 U.S. 1123, 106 S.Ct. 1991, 90 L.Ed.2d 672 (1986).

Every claim of potential jury prejudice due to publicity must turn upon its own facts. Marshall, 360 U.S. at 312, 79 S.Ct. at 1173. The government contends that the record conclusively shows that the El Paso Herald-Post article was not highly prejudicial to

should make an independent determination whether the juror's impartiality was destroyed." In Hyde, the news stories in question essentially "summarized the high points of the days' events." When the defense brought the articles to the court's attention, on at least one occasion the court asked the jury as a whole whether any of them had read the articles. On another occasion, the defense attorneys themselves declined the offer of interrogation of the jurors regarding any prejudicial influence. Again, Hyde is distinguishable from the instant case. In Hyde, the court took the necessary precautions to determine whether the jury was exposed to the articles. Further, in contrast to this case, the articles in question essentially were not prejudicial. See also United States v. Davis, 583 F.2d 190, 197 (5th Cir. 1978) (setting forth Hyde's factors as an "acceptable procedure" in addressing prejudicial publicity).

the appellants and that the district court's cautionary instructions to the jury negated the possibility that the publicity reached the jury. An after-the-fact analysis must be made to respond properly to the government's assertions. We first determine whether the news material was innately prejudicial. It is well established that "news stories published during the trial that reveal to jurors a defendant's prior criminal record are inherently prejudicial." United States v. Williams, 568 F.2d 464, 469 (5th Cir. 1978); see also Murphy v. Florida, 421 U.S. 794, 798, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975) ("persons who have learned from news sources of a defendant's prior criminal record are presumed to be prejudiced"); Marshall, 360 U.S. at 312-13, 79 S.Ct. at 1173 ("[t]he prejudice to the defendant is almost certain to be as great when that evidence reaches the jury through news accounts as when it is a part of the prosecution's evidence . . . . It may indeed be greater for it is then not tempered by protective procedures."). Thus, at a minimum, the references to Aragon's prior convictions constituted inherently prejudicial evidence.

Further, nothing in the record makes any noticeable mention of the appellants' alleged dealings with the Ontiveros crime family. The newsstory mention of the crime family connections went beyond the record and raised serious questions of possible prejudice. Overall, the publicity clearly crosses Herring's initial threshold; the substance of the article may be taken as probative of the appellants' guilt. It is innately prejudicial.

In ascertaining next the likelihood that the publicity actually reached the jury, we examine the prominence of the media's coverage in conjunction with the trial court's instructions to the jury concerning trial publicity. The newspaper article was not published in an obscure manner nor did it detail merely procedural, mundane aspects of the trial. It referred to the smuggling of over thirty-two tons of marijuana, to connections to a state senator, and to dealings with a notorious "narcotics kingpin". Further, in this case, the jurors were not sequestered, they were not prohibited by the court from the general reading of newspapers, nor were they provided with newspapers with the relevant portions struck from them. The article appeared in the front page of the Metro section of the most widely circulated local paper.[9] Under our reading of the court's instructions, the jury was merely told to avoid reading about or listening to media reports concerning the case itself. We conclude that such a selective prohibition against reading about the case, done rather quickly and casually by the court, did not obviate the court's need for inquiry. We disagree with the government's contention that the trial court's two admonitions concerning media coverage in this case were "more than adequate safeguards" to ensure the appellants a fair trial.

This conclusion is not enough; we need to proceed further. In the absence of a poll, it is impossible to determine whether the jurors were actually exposed to the article. We would have to

---

[9] The government, at oral argument, acknowledged that newspaper vending machines surrounded the courthouse.

12

speculate to conclude that no juror saw or heard the account, and thus, that the appellants were not unduly prejudiced. Herring dissuades us from indulging in such speculations. 568 F.2d at 1106.[10] Thus, having reviewed the conspicuousness of the news account and its prejudicial content, notwithstanding the court's general instruction to the jury, we conclude that there was a substantial probability that the publicity reached the jurors present.

The government asserts that the record shows conclusively that the article was not highly prejudicial and that the district court's cautionary instructions to the jury negated the possibility that the publicity in fact reached them. The government in its contention relies upon Harrelson, Manzella, and Arzola-Amaya, three cases previously mentioned.[11]

In Harrelson, 754 F.2d 1153, this Court determined that the trial judge's instructions adequately shielded the jury from prejudice. There the judge furnished newspapers to the jury which

---

[10] At oral argument, the government conceded that if this Court indulged in the presumption that the article reached the jurors, then, at least with regard to Aragon, the trial court's failure to poll the jury would constitute reversible error.

[11] The government also incorrectly contends that the appellants' reliance on Herring is inapposite. In Herring, this Court found that the district court's instructions regarding publicity were inadequate. There the jury was told merely to pay no attention to any publicity. 568 F.2d at 1101. We found that under this instruction "a juror could assimilate any publicity in the case with a firm resolve not to be affected by it, and then in good conscience believe that he had followed the court's instructions to the letter." 568 F.2d at 1101 n.6. Appellants, however, properly do not contend that the Herring facts are clearly analogous. They simply utilize Herring for the two-step inquiry it articulated.

13

had references to the trial struck from it.  At the start of each day trial session, the judge asked the jury if they had heard anything about the case other than from the evidence at trial. Unlike Harrelson, we find that the trial judge's instructions failed adequately to shield the jury from contamination.  The judge did not admonish the jury not to read or listen to external news altogether.  Further, the court did not furnish newspapers to the jury with the relevant references to the trial struck from them. Most important, under the facts of this case, however, the judge did not make daily pointed inquiry whether the jury knew or had heard anything relating to the case other than the evidence presented at trial.  The record shows it made no such inquiry at all.

In Manzella, 782 F.2d 533, we affirmed an appellant's conviction despite the district court's failure to voir dire the jury after the publication of a newspaper article concerning the trial.  We determined that though the reference to a prior conviction in the article was prejudicial, the chances of its actual influence over the jury's decision was "minuscule."  782 F.2d at 543.  The inadmissible information constituted one small paragraph at the end of the medium-length article.  Further, we concluded that the court's admonitions to  the jury to avoid trial publicity were sufficient to convince the jurors to avoid media coverage.  Finally, we commented that "[t]he jury's ability to discern [the defendant's] innocence of some of the alleged crimes indicates a fair-minded consideration of the case against him"; the

14

publicity did not lead to a deprivation of the appellant's right to an impartial jury. 782 F.2d at 543.

By comparison, in this case, the inadmissible information was not an insignificant portion at the end of the article. It was a major thrust. Further, the article's influence can hardly be deemed minor. Moreover, the court in this case failed to impress adequately on the jury the need to avoid publicity about the trial. Lastly, to the degree that the jury's ability to convict the appellant on some counts but not on others might constitute a make weight indicatory of jury impartiality, this case is to the contrary. The jury convicted the appellants on all counts.

In Arzola-Amaya, 867 F.2d 1504, this Court ruled that the trial court properly denied the appellants' repeated requests to poll the jury regarding mid-trial publicity. Although there was media coverage throughout the trial, the trial court correctly had found that it was based upon reports of the trial proceeding. These reports covered matters which had occurred in the presence of the jury. 867 F.2d at 1514. Further, the judge's cautionary instructions to the jury were careful and specific, ensuring that the appellants received a fair trial free from prejudice. Finally, we again relied in part upon Manzella: "[t]he jury's ability to discern a failure of proof of guilt of some of the alleged crimes indicat[ed] a fair minded consideration of the issues." Id.

In contrast, in this case, the article went far beyond a record of the trial's daily occurrences. It included substantial highly prejudicial information which the jury was not entitled to

15

get and did not get in court. We also find that the court did not give carefully delineated instructions to the jurors concerning mid-trial publicity. Finally, similar to our comparison with Manzella, if the ability to discriminate among the charges is an indicia of impartiality, once again, the jury failed.

We cite United States v. Williams, 809 F.2d 1072, 1092 (5th Cir. 1987), as much more closely paralleling this case. In Williams, a month into trial a government witness testified that the defendants were involved in drug deals even during the trial. The witness' testimony severely affected the defendants. Their bail was revoked and they were returned to the custody of the United States Marshal. The media coverage was extensive, including "front-page headlines with a color photograph of the [defendants] being led away in handcuffs and chained together from the courthouse in one of Houston's daily newspapers." 809 F.2d at 1091 (footnote omitted). We applied the Herring two-step inquiry and concluded that it was reversible error for the trial court not to inquire as to the possible contamination of the jury. We first determined that the initial Herring step was satisfied--the nature of the publicity clearly went beyond the record and was highly prejudicial. Similarly, we found that the second inquiry was also satisfied. The information was not published in an obscure way; rather, it was published with headlines visible at any newspaper vending machine. Further, the jury was not sequestered. Just as in the instant case, the judge in Williams merely instructed the jurors "not to read or listen to anything pertaining to this case."

16

Here, the trial court was apprised of the existence of a potentially highly prejudicial article. Without undertaking any inquiry, the court squarely rejected the appellants' motion for voir dire. Cognizant of Marshall's teachings that such publicity cases are fact specific, under these circumstances we find that the district court abused its discretion in failing to undertake adequate inquiry into whether the alleged tainting incident occurred and whether it was prejudicial.

## III. CONCLUSION

In this case, general newspaper reading was allowed under instructions to the jury, although the jury was told not to read about the trial. The critical article was prominently located on the front page of the Metro section of the newspaper. The article went into substantial detail and went well beyond the record. This newspaper publicity raised a significant possibility of prejudice, but the district court did not make requisite inquiry into the possible prejudice. It failed to make its own independent determination as to the alleged intrusion upon jury impartiality. Under the specific facts of this case, we reverse for a new trial.

REVERSED.

17