# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 12, 2011

Lyle W. Cayce
Clerk

No. 09-11080

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

JAMES MCDANIEL,

Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Texas
U.S.D.C. No. 3:08-cr-00051-L-ALL

Before JONES, Chief Judge, and DENNIS and CLEMENT, Circuit Judges.

PER CURIAM:[*]

The defendant, James McDaniel, was convicted of (1) managing or controlling a drug-involved premises; (2) possessing a firearm in furtherance of his maintenance of a drug-involved premises; (3) possessing cocaine with intent to distribute; (4) possessing a firearm in furtherance of a drug trafficking crime; and (5) distributing an illegal drug the use of which resulted in a person's death. He appeals, arguing that (1) the district court erred in rejecting his *Batson* claim; (2) the district court abused its discretion denying his request for a

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 09-11080

mistrial after a prosecution witness gave what McDaniel argues was unfairly prejudicial testimony; (3) the district court abused its discretion in denying his request for a mid-trial voir dire to ask jurors about their exposure to prejudicial news coverage of the trial; and (4) the district court abused its discretion in refusing to instruct the jury that it had to agree unanimously on the dates on which he possessed the cocaine and firearms.[1] We AFFIRM.

## I.

The district court held a two-day voir dire in order to select the jury. At one point, the judge inquired of the entire venire whether they "had any experience involving yourself, a member of your family, or any close friend that relates to the use or possession of illegal drugs or narcotics." As relevant to this appeal, two prospective jurors, Keith Slyter, who is white, and Teresa Johnson, who is the same race as McDaniel, black, responded in the affirmative. Later, the prosecution asked Slyter to elaborate on his answer and Slyter stated that his brother had gone to prison for selling narcotics, an action which Slyter characterized as "totally idiotic." Slyter further stated that he is "not that close to" his brother and therefore could hear the case without being influenced by his brother's experience. There was no similar follow-up questioning of Johnson. The prosecution used one of its peremptory strikes against Johnson, but did not strike Slyter.

Based on these events, and on the fact that the prosecution had exercised a disproportionate number of its peremptory strikes against prospective jurors who were black, the defense made an objection under *Batson v. Kentucky,* 476 U.S. 79 (1986). The judge explained, "The Supreme Court and Fifth Circuit make

---

[1] McDaniel also argues that the district court erred in concluding that it was required to sentence him to a term of imprisonment for his firearms charges that ran consecutive to his term of imprisonment for distributing narcotics resulting in a death. However, he acknowledges that this claim is foreclosed by *United States v. London*, 568 F.3d 553 (5th Cir. 2009), *cert. denied* 131 S. Ct. 631 (2010). Therefore, it is not addressed further in this opinion.

it clear that the first part of the analysis [for such an objection is] that the person making the challenge [must] make a prima facie case that a potential juror is being excluded because of race. And if a prima facie case is made, then the burden then shifts to the other side to provide a race neutral explanation. And at the third stage, the person making the challenge must show that there [was] purposeful discrimination."

Applying this framework, the judge stated that in light of defense counsel's argument, "I think the defense has made a prima facie case of excluding black jurors. Forty percent of the government's strikes were African American. Fourteen percent of the eligible pool to constitute the twelve person jury was African American."

The judge then indicated that he was proceeding to the second step of the analysis and heard from the government. The prosecutor explained that he had struck Teresa Johnson because "she indicated that she had a close family member with a . . . recent drug conviction. . . . The government struck all jurors within the strike panel . . . that indicated that they had close family members with drug convictions." The prosecutor then explained that Slyter was not struck because "he was not close to his brother. . . . He indicated that he was estranged from his brother at the time his brother was incarcerated for the drug conviction and even went so far as to say his brother lives in Michigan. . . . That indicated to me that was a distance - - enough distance that that would not qualify as a close family member[,] [t]hat caused me concern." The judge then inquired whether the prosecutor had asked any follow-up questions of Johnson to determine the nature of her relationship with her cousin who had been convicted of selling drugs, and the prosecutor responded that he had not. As a result, the judge asked, "why did you find it necessary to call Mr. Slyter forth and question him and not do the same as to Ms. Teresa Johnson?" The prosecutor replied that the further questioning related to Slyter's relationship with his brother was "an

afterthought." The prosecutor had selected Slyter for additional questioning regarding whether he was personally acquainted with one of the government's attorneys, and had only made additional inquiries about Slyter's relationship with his brother following this other questioning.

The district court then provided the defense an opportunity to respond. Defense counsel stated, "Ms. Johnson didn't say anything about this family member being close to her. . . . Nothing about Ms. Johnson's demeanor or what she said or the way she said it indicated to this [sic] was an issue for her or that this was as the government has stated a close family member. . . . The government propounded no question to [Johnson to examine this issue]."

The court then recessed. Upon returning, the judge explained that, having concluded that the defense had established a prima facie case, "[w]e move to the next phase and the Court heard the explanation given by the government. . . . After hearing [the government's] explanation as to why the individuals in question were stricken, the Court is satisfied that [the government] has articulated or set forth a race neutral basis for excluding [Johnson]. As the Supreme Court said . . . , the explanation does not have to be persuasive or plausible, but the Court states on the record that the explanation given by [the prosecution] is plausible, therefore, the defense's challenge to the juror[] based upon the *Batson* case is denied."

At trial, the prosecution presented overwhelming evidence on each count. It introduced a videotape showing McDaniel retrieving bags of cocaine from a safe he kept in his apartment. Numerous witnesses testified to McDaniel's drug trafficking and that they had seen him with firearms when they bought drugs from him. One witness testified that Meaghan Bosch—the young woman who the prosecution alleged had died as a result of drugs distributed by McDaniel—was at McDaniel's apartment and under the influence of narcotics the night she disappeared. Another witness testified that he had seen Bosch

unconscious and slumped over in McDaniel's residence and had urged McDaniel to let her be taken to the hospital, but that McDaniel had refused. The same witness testified that McDaniel later admitted to him that Bosch had died. The prosecution also presented DNA evidence indicating that McDaniel could not be excluded as the source of DNA found on Bosch's body, and that dog hairs found on a blanket found wrapped around Bosch's body matched dog hairs found in McDaniel's apartment.

At one point, the defense moved for a mistrial in light of testimony presented by the prosecution that carried sexual connotations, presenting a risk of unfair prejudice. Prior to trial, the prosecution had indicated that it intended to present evidence "regarding [McDaniel's] alleged sexual assault of 12 young women," in addition to evidence suggesting that McDaniel had sexually assaulted Bosch. The district court held this evidence inadmissible under Federal Rule of Evidence 403 because the risk of unfair prejudice from the evidence substantially outweighed its probative value. The judge stated that "I expect there will be testimony concerning statements about drug use or what was going on . . . , but let me make it unequivocally clear, any witness who comes, I do not want that witness talking about any alleged rapes." Nonetheless, as the trial progressed, the judge felt the need to reprimand the prosecution for "slip up after slip up after slip up" in eliciting testimony that, at the very least, implied that McDaniel had had sexual contact with Bosch. This included testimony from one witness that she was afraid of McDaniel because she was a "single white female," and an expert's testimony about a DNA sample taken from the "crotch" of McDaniel's shorts. Finally, Tiffany White, a former employee in McDaniel's illegal operations, testified that McDaniel possessed "GHB." The prosecutor then asked, "What do you understand GHB to be?" and White responded, "A date rape drug." Following this statement, defense counsel moved

for a mistrial. The judge held a bench conference and admonished the prosecutors, but denied the motion.

Also during the trial, the *Dallas Morning News* published several articles on the front page of its metro section containing information that was prejudicial to McDaniel. Those articles revealed the allegation that McDaniel had sexually assaulted 12 women, and also revealed that he had previously spent 22 years in prison for murdering a former police officer.

Recognizing that the media would report on the trial, the district judge had taken numerous steps to prevent this coverage from influencing the jury. During voir dire, the judge indicated that he had "instructed that the TV be turned off in the jury room and also any newspaper or other media type material be removed from the jury room." At the end of the first day of voir dire, he informed the prospective jurors: "You are instructed that you are not to read, listen to, or watch any media accounts about this trial. If something comes on TV, you are not to watch it. If there is something in the paper, once you start reading something in the paper and you find out about this trial, you are not to read that matter. . . . Do not talk to the media about the case. In fact, do not even talk to coworkers about the case. Do not talk to your spouse or friends."

At the start of the trial on May 27, the judge gave the jury a lengthier instruction stating:

> [D]o not read or listen to anything touching on this case in any way. If anyone tries to talk to you about this case, bring it to the Court's attention promptly and the way you do that is to contact . . . Court security officers and that person in turn will contact me.

> It is very important that you not listen to, read, or watch any accounts of this case. As I stated before, you took an oath to decide this case based upon the evidence that is presented here during the course of this trial. And it is very important that you follow that oath. Keep in mind the media accounts and other accounts you may read do not show the entire picture. You are here. You see the entire case from beginning to end and you are in the best position to assess

No. 09-11080

the evidence. So there is no need to go to any other source as to what is taking place in this trial.

. . . [D]o not try to do any research or make any investigation about the case on your own. Once again, everything you need to know about this case will be presented during the course of this trial in the way of evidence either oral testimony or exhibits and documents.

At the end of the next day, May 28, the judge stated: "Remember my earlier discussion. . . . Do not watch, listen to or read any media accounts about the case if there are any. Do not let anybody discuss the case with you." On June 1, the judge again issued a similar instruction. He did the same at the close of the next day's testimony. The judge again gave a similar instruction at the close of the evidentiary phase of the trial on June 4.

Nonetheless, at times, the judge expressed skepticism that his instructions were being followed. At a bench conference the judge stated: "We have to hope - - although I don't believe that the jury doesn't read [the paper] - - but I have no proof of that." Moreover, near the close of evidence, the judge requested that the defense make its Rule 29 motion for judgment of acquittal "in chambers because everything that you say is going to be in the paper and the Court's ruling will be in the paper also. I don't think that is something the jury needs to hear . . . ."

On the second-to-last day of the evidentiary phase, following the prosecution's DNA expert's statement that DNA was found on the "crotch" of McDaniel's shorts, defense counsel asked "the Court [to] ask individual jurors if they read today's or other news accounts about the trial." The court did not immediately rule on the motion and defense counsel renewed it the next day, at which point the motion was denied.

The judge stated:

The law is that jurors are presumed to follow the Court's instructions. That is, they are presumed to adhere to them and abide by them. Unless there is some type of evidence that I get to

7

the contrary I do not believe there is any reason for me to individually talk to the jurors at this time. This is a high profile case. There are all types. There are high profile cases, and I find for the most part that once a person becomes a juror, at least in my experience, they do attempt to follow the court's instructions.

As I stated before, I have talked to every juror after a trial whether civil or criminal, and on several of those occasions, they have told me we were wondering about this, but you instructed us judge not to consider this, and we didn't take it into account. But we are human, but we did follow your instructions.

Finally, immediately prior to closing arguments, the district court announced that it would strike from its jury instruction on count 3—charging McDaniel with possessing cocaine with the intent to distribute—a statement that "for you to find Defendant McDaniel guilty you must unanimously agree on the occasion that he committed the offense." The court explained that this language was superfluous in light of the other instructions it planned on giving to the jury. Indeed, the court instructed the jury that "The government does not have to prove that the crimes were committed on [the] exact date [listed in the Indictment], so long *as it proves* beyond a reasonable doubt that Defendant McDaniel committed the crimes on *a date reasonably near the date stated* in the Indictment." (emphasis added). Moreover, the court informed the jury that "Your verdict must be unanimous." Nonetheless, the defense objected to the omission from the instruction on count 3 of the language that the verdict must be unanimous, and the court overruled the objection.

The jury found McDaniel guilty on all counts. The district court sentenced McDaniel to life imprisonment on count five—selling drugs the use of which resulted in Bosch's death—and an additional thirty years related to the other charges.

No. 09-11080

## II.

*Batson Issue*

McDaniel argues that the district court erred in denying his *Batson* challenge regarding the prosecution's strike of prospective juror Johnson because (1) the district court failed to carry out the third step of the *Batson* analysis, failing to rule on whether the strike of prospective juror Johnson was racially motivated, and (2) even if the court did rule upon this issue, the record demonstrates that the strike was racially motivated and thereby violated *Batson*.

"[I]t is a fixed part of our constitutional landscape that '[t]he use of peremptory challenges to strike venire-persons based on their race violates the equal protection component of the Due Process clause of the Fifth Amendment.'" *United States v. Williamson*, 533 F.3d 269, 274 (5th Cir. 2008) (quoting *United States v. Montgomery*, 210 F.3d 446, 453 (5th Cir. 2000)). "*Batson v. Kentucky* establishes a three-pronged inquiry to determine whether a peremptory challenge was based on race: 'First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; s]econd, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question[; and t]hird, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.'" *Id.* (alterations in original) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 476-77 (2008)).

"We review the district court's conclusion on whether the peremptory strikes were racially motivated for clear error." *Id.* (quoting *United States v. Williams*, 264 F.3d 561, 571 (5th Cir. 2001)) (internal quotation marks omitted). This circuit and the Eighth Circuit have also recognized that a district court may make "implicit" findings while performing the *Batson* analysis. See *Stevens v. Epps*, 618 F.3d 489, 499 (5th Cir. 2010) (noting that trial courts sometimes make

"implicit[]" findings when carrying out the *Batson* analysis); *U.S. Xpress Enter., Inc. v. J.B. Hunt Transp., Inc.,* 320 F.3d 809, 814 (8th Cir. 2003) (concluding that the district court did not err in performing the *Batson* analysis because "[a]lthough the trial court did not articulate for the record that Bush proved purposeful racial discrimination, we are convinced such a determination was necessarily made"); *United States v. Hughes*, 50 F.3d 1033, 1995 WL 136200, at *2 (5th Cir. Mar. 9, 1995) (unpublished table opinion) (noting that a trial court could make "implicit" findings supporting a *Batson* analysis). Therefore, a district court will not be reversed for failing to explicitly detail its findings at each step in the *Batson* analysis, if we are convinced that the necessary determinations were "implicitly" made.

Based on the record recounted above, we conclude that the district court proceeded through each step of the *Batson* analysis, explicitly ruling on the first two steps and implicitly passing on the third. As explained above, at the start of the hearing on the defense's motion, the judge explicitly laid out the proper three-step *Batson* inquiry. He then undertook the first two steps in order—finding that the defense had established a prima facie case, then inquiring of the prosecutor why he had struck prospective juror Johnson and not prospective juror Slyter, and concluding that the prosecutor's explanation for this facially disparate treatment was plausible. The judge also provided defense counsel an opportunity to respond to the prosecutor's explanation, indicating that he was considering the third step of the *Batson* analysis. Further, after both parties' submissions, the court recessed, providing the judge time to weigh the arguments and evidence. After returning, the judge explained that *because* he found the prosecution's explanation for the strike plausible, the motion was denied. While the judge did not specifically state the conclusion that the prosecution's strike was not racially motivated, we conclude that on this record

No. 09-11080

that the judge implicitly made such a finding and therefore it did not procedurally err in performing the *Batson* analysis.

Because we conclude that the district court implicitly found that the strike of prospective juror Johnson was not purposefully discriminatory, McDaniel must show that this finding was clearly erroneous in order to prevail in his *Batson* challenge. *Williamson*, 533 F.3d at 274. He argues that the strike was necessarily discriminatory because the prosecutor's proffered reason for striking prospective juror Johnson, a black person—that she indicated she had friends or family who had been convicted of drug-related offenses—was also true of prospective juror Slyter, a white person, who the prosecutor did not strike. He further argues that the prosecutor treated Johnson and Slyter disparately by giving Slyter, but not Johnson, a chance to explain away his family tie to someone with a drug conviction. However, McDaniel points to nothing in the record that undermines the district court's implicit finding that—as the prosecutor stated—any disparate treatment between prospective jurors Johnson and Slyter was a product of happenstance, rather than purposeful discrimination: namely, that the prosecutor asked Slyter follow-up questions about his brother as an "afterthought" to unrelated questioning. We therefore conclude that McDaniel has failed to show that the district court clearly erred in finding that the strike was not purposefully discriminatory.

*Denial of Motion for Mistrial*

McDaniel argues that the district court erred in denying his motion for a mistrial after the prosecution elicited testimony that McDaniel possessed a "date rape drug," thereby implying that McDaniel was a rapist.

"When improper evidence is introduced to the jury but a defendant's subsequent motion for mistrial is denied, we review the denial for abuse of discretion and, if we find error, we apply harmless error review." *United States v. Lucas*, 516 F.3d 316, 345 (5th Cir. 2008) (citing *United States v. Valles*, 484

11

No. 09-11080

F.3d 745, 756 (5th Cir. 2007)). Without deciding whether improper evidence was introduced or whether the district court abused its discretion in denying the motion for a mistrial, we conclude that any error was harmless and therefore affirm on this issue. As stated above, the evidence against McDaniel was overwhelming. It included a videotape of him possessing drugs at his residence, the testimony of multiple witnesses that McDaniel sold drugs and possessed firearms while he was distributing drugs, and the testimony of a witness that Bosch was at McDaniel's residence under the influence of narcotics the night that she went missing. Another witness also testified that he had informed McDaniel that Bosch needed medical attention, but that McDaniel had refused to allow her to receive treatment. Forensic evidence further linked a blanket found wrapped around Bosch's corpse to McDaniel's residence. Therefore, we conclude that even if the testimony regarding McDaniel's possession of a "date rape drug" was improperly elicited and unfairly prejudiced the jury against McDaniel, it was a harmless error.

*Denial of Mid-Trial Voir Dire*

McDaniel argues that the district judge erred in refusing to conduct a mid-trial voir dire to determine whether the jury had been exposed to and influenced by potentially unfairly prejudicial coverage of the case by the *Dallas Morning News*.

"The trial judge has broad discretion in ruling on the issue of prejudice resulting from a jury's exposure to news articles concerning a trial." *United States v. Aragon*, 962 F.2d 439, 443 (5th Cir. 1992). "[I]t is for the trial judge to decide at the threshold whether news accounts are actually prejudicial; whether the jurors were probably exposed to the publicity; and whether jurors would be sufficiently influenced by bench instructions alone to disregard the publicity." *Id.* (quoting *Gordon v. United States*, 438 F.2d 858, 873 (5th Cir. 1971)) (internal quotation marks omitted). Therefore, "[t]he standard for review of the exercise

12

of the district court's discretion in a case such as this is abuse of that discretion." *Id.* "[A] critical factor in weighing the probability that the jury was exposed to the prejudicial publicity is the procedure adopted by the district judge to shield the jury from the publicity. The cases place great emphasis on the particular instructions given to the jury by the trial judge to minimize or eliminate the danger of jury contamination by prejudicial publicity. For instance, we declined to reverse convictions due to midtrial publicity in [*United States v.*] *Faulkner*, 17 F.3d [745,] 764 [(5th Cir. 1994)], in part because the judge gave preliminary jury instructions regarding the need to avoid press reports which were 'unusually lengthy and emphatic,' rather than 'boilerplate or casual recitations of standard jury instructions.'" *United States v. Bermea*, 30 F.3d 1539, 1558-59 (5th Cir. 1994); *see also United States v. Harrelson*, 754 F.2d 1153, 1164 (5th Cir. 1985) ("Our painstaking examination of the entire record and the trial court's repeated instructions convinces us that the jury was effectively shielded from contamination by publicity during the trial.").

Here, while the district judge clearly believed that the news coverage was prejudicial, it was within his discretion to conclude that a mid-trial voir dire was unnecessary because his instructions were sufficient to prevent the jury from being influenced by that coverage. He gave lengthy and repeated instructions informing the jury that they were not to read any news coverage of the case. Moreover, the judge took proactive steps to reduce the likelihood that the jury would be exposed to such stories, removing media from the jury room even before the trial started. Therefore, the judge did not abuse his discretion in denying mid-trial voir dire.

McDaniel highlights the two parenthetical remarks the judge made, seeming to suggest that he believed the jury had been or would be exposed to the *Dallas Morning News* stories—one stating that the judge hoped but did not believe "that the jury doesn't read [the paper]," and another indicating that the

No. 09-11080

Rule 29 motion for judgment of acquittal should be made in chambers so that it would not be reprinted into the papers and thus be read by the jury. However, in denying the motion for mid-trial voir dire, the judge concluded that there was no evidence the jury had been exposed to the *Dallas Morning News* stories and stated that in his experience jurors do "attempt to follow a court's instructions." In this manner, the judge clearly and specifically determined that, although some jurors might have been exposed to the prejudicial coverage, he believed that his instructions were effective to prevent the jury's deliberations from being affected. Neither McDaniel nor the record provides us with any reason to question the district court's conclusion.

McDaniel also points to this court's decision in *Aragon*, in which a panel wrote that "[i]n the absence of a poll, it is impossible to determine whether the jurors were actually exposed to the article." 962 F.2d at 445. The *Aragon* panel continued that "indulging in such speculations," *id.*, was improper and therefore "the district court abused its discretion in failing to undertake adequate inquiry into whether the alleged tainting incident occurred and whether it was prejudicial," *id.* at 447. However, in *Aragon*, the district court "failed to make its own independent determination as to" the possibly prejudicial newspaper coverage's "alleged intrusion upon jury impartiality." *Id.* Moreover, the *Aragon* panel did not indicate that the district court provided any special instructions to the jury regarding prejudicial media coverage, stating only that "general newspaper reading was allowed under instructions to the jury, although the jury was told not to read about the trial." *Id.* These facts distinguish *Aragon* from the instant case, in which the district court clearly took the concern of prejudicial news coverage seriously and gave multiple emphatic instructions attempting to affirmatively prevent that coverage from infecting the jury's deliberations. Based on the instant record, unlike in *Aragon,* we cannot say that the district court abused its discretion in denying mid-trial voir dire.

No. 09-11080

*Denial of Unanimity Instruction*

Finally, McDaniel argues that the district court erred in refusing to instruct the jury that it had to unanimously agree on the dates on which McDaniel possessed narcotics and firearms in order to convict him of possession with intent to distribute and the two firearm possession offenses.[2]

"[W]e review 'all challenges to, and refusals to give, jury instructions for abuse of discretion.'" *United States v. Davis*, 609 F.3d 663, 689 (5th Cir. 2010) (quoting *United States v. Webster*, 162 F.3d 308, 321-22 (5th Cir. 1998)). "A refusal to give a requested instruction constitutes reversible error only if the proposed instruction (1) is substantially correct, (2) is not substantively covered in the jury charge, and (3) pertains to an important issue in the trial, such that failure to give it seriously impairs the presentation of an effective defense." *Id.* (quoting *Webster*, 162 F.3d at 321-22) (internal quotation marks omitted). Here, we conclude that McDaniel has failed to establish the second element, that the unanimity instruction he requested was not substantially covered elsewhere in the jury charge. The court instructed the jury that when the prosecution alleged that a crime occurred on a specific date, an element of that offense was that the prosecution had to establish that the crime occurred on "*a date* reasonably near the date stated in the Indictment." (emphasis added). Moreover, it informed the jury that "[y]our verdict must be unanimous." Therefore, we conclude that the district court did not abuse its discretion in refusing to give the requested instruction.

---

[2] McDaniel acknowledges that he did not preserve some of these arguments below. Because we conclude that McDaniel's claims lack merit under the standard of review for preserved errors, we need not differentiate the claims that he preserved from those that he waived.

No. 09-11080

## III.

For the foregoing reasons, the defendant's convictions and sentences are AFFIRMED.